**[J-102-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

EUGENE R. YENCHI AND RUTH I.
YENCHI, HUSBAND AND WIFE,

                Appellees

                v.

AMERIPRISE FINANCIAL, INC.,
AMERIPRISE FINANCIAL SERVICES,
INC., RIVERSOURCE LIFE INSURANCE
COMPANY AND BRYAN GREGORY
HOLLAND,

                Appellants

: No. 8 WAP 2016
:
:
: Appeal from the Order of the Superior
: Court entered September 15, 2015 at
: No. 753 WDA 2014, vacating the
: Judgment of the Court of Common
: Pleas of Allegheny County entered May
: 5, 2014 at No. GD 01-006610, and
: remanding.
:
: ARGUED: November 1, 2016
:
:
:
:
:
:
:
:

**OPINION**

**JUSTICE DONOHUE**                        **DECIDED: JUNE 20, 2017**

In this discretionary appeal, we must decide whether a fiduciary duty can arise in a consumer transaction for the purchase of a whole life insurance policy based upon the advice of a financial advisor where the consumer purchasing the policy does not cede decision-making control over the purchase to the financial advisor. We conclude that, consistent with our jurisprudence, no fiduciary duty arises in such a situation. Consequently, we reverse the Superior Court's decision to the contrary.

In 1995, Bryan Holland ("Holland"), a financial advisor for IDS Life Insurance Corporation, made an unsolicited telephone contact, a "cold call," to Eugene and Ruth Yenchi (the "Yenchis") and asked to meet with them regarding their "financial stuff." At

the initial meeting, Mr. Yenchi informed Holland that he had a long-term disability policy, and Holland asked him to bring it with him to their next meeting. At this second meeting, Holland reviewed the disability policy and advised the Yenchis to keep it, as it was a good policy and he could not offer them a comparable product.

At a subsequent meeting in December 1995, for a fee of $350, Holland presented the Yenchis with a financial management proposal (the "Proposal"). The Proposal contained a notice that it had been prepared by "your American Express financial advisor" (Holland) and that "[a]t your request, your American Express financial advisor can recommend products distributed by American Express Financial Advisors and its affiliates as investment alternatives for existing securities." Complaint, 11/13/2003, Exhibit 1, at 3. The Proposal offered the Yenchis a number of general recommendations, including that they monitor monthly expenses, consolidate their debt, consider various savings plans, consolidate current life insurance policies into one policy, review long-term care coverage, keep accurate records for tax purposes (medical expenses and charitable contributions), transfer 401(k) funds into mutual funds, and continue estate planning with an attorney and their financial advisor. *Id.* at 7-8. The Yenchis implemented some of these recommendations, saving money in an investment certificate and opening an IRA account.

With respect to the consolidation of life insurance policies, the Yenchis provided Holland with relevant information regarding their current policies with Met Life (five held by Mr. Yenchi and two by Ms. Yenchi). In January 1996, Holland proposed a whole life insurance policy for Mr. Yenchi with an initial $115,000 death benefit. In June 1996, he proposed a similar policy for Mr. Yenchi with an initial $100,000 death benefit, plus a $25,000 rider for Ms. Yenchi. Mr. Yenchi purchased the latter policy, cashing out his five Met Life policies to make the initial payment. Because Mr. Yenchi also purchased

the rider for Ms. Yenchi, she did not need to cash in her existing life insurance policies for a new one. Instead, in 1997 Ms. Yenchi used the proceeds from her two Met Life policies to purchase a deferred variable annuity. In 1998, Holland proposed that the Yenchis increase their life insurance coverage to $300,000, but they rejected Holland's advice on this occasion, deciding that they had enough life insurance.

In 2000, the Yenchis had their portfolio independently reviewed. Through this process, they were advised that the 1996 whole life insurance policy Mr. Yenchi had purchased was underfunded, destined to lapse, and that additional premiums beyond those allegedly represented by Holland,[1] at substantially high rates increasing over time, would have to be paid. They also learned that Ms. Yenchi's 1997 deferred variable annuity would not mature until 2025, when she was eighty-four years old (rather than sixty-five, as had allegedly been represented by Holland).

In April 2001, the Yenchis initiated suit by writ of summons, naming as defendants American Express Financial Services Corporation, American Express

---

[1] In their complaint, the Yenchis admitted that Holland presented them with a "Life Protection Plus Illustration" (the "Illustration") that provided the essential terms of the whole life policy. Complaint, 11/13/2003, ¶ 147. These terms included: (1) an initial death benefit of $100,000, decreasing to $90,000 at age 70, and to $80,000 at age 80; and (2) an initial payment of $17,500, with monthly premium payments of $240 in years one through eight, of $2390.45 in year nine, $784.65 in year ten, and $2887 in year eleven. Motion for Summary Judgment, Exhibit 1, Deposition of Eugene Yenchi at 105 (Dep. Ex. 2). The Illustration included separate columns for interest at the current (5.85%) and guaranteed (4%) interest rates, and further indicated that there would be no surrender value at age 82. Id. In connection with the purchase of the policy, Mr. Yenchi signed a disclosure statement which indicated that current interest rates were not a prediction of future policy performance. Id. at 105-07.

At his deposition, Mr. Yenchi testified that Holland represented to him that the monthly premiums on the policy would be $240 for eight years, at which time the policy would be paid off. Id. at 125-26. At trial, Mr. Yenchi testified that he understood that if he paid the $240 monthly premium, the payout would be "guaranteed." N.T., 1/28/2014, at 720. The Illustration was introduced at trial as Exhibit 20. Id. at 705.

Financial Advisors Corporation, IDS Life Insurance Company,[2] and Holland (collectively, "Appellants"). The Yenchis' complaint, filed in November 2003, asserted claims of negligence/willful disregard,[3] fraudulent misrepresentation, violation of the Uniform Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1-201-9.3, bad faith, negligent supervision, and breach of fiduciary duty.

By order dated March 21, 2013, the trial court granted summary judgment to Appellants on all claims relating to the 1997 purchase of the deferred variable annuity, and dismissed the claims for bad faith, negligent supervision and breach of fiduciary duty relating to the 1996 purchase of the whole life insurance policy. Of relevance here, with respect to the breach of fiduciary duty claim, the trial court held that no fiduciary relationship was established between the Yenchis and Holland because the Yenchis continued to make their own investment decisions. Trial Court Memorandum, 7/28/2014, at 3. The trial court cited to its own prior decision in *Ihnat v. Pover*, 146 P.L.J. 299, 303-10 (1999), in which it held that no fiduciary duty arises between an insurance agent and a policyholder unless the policyholder delegates decision-making

---

[2]  American Express Financial Services Corporation is now known as Ameriprise Financial, Inc. American Express Financial Advisors Corporation is now known as Ameriprise Financial Services, Inc. IDS Life Insurance Company is now known as RiverSource Life Insurance Company.

[3]  The first count of the Yenchis' complaint commingles allegations relating to both professional negligence (e.g., that Appellants breached a duty to exercise reasonable care, skill and diligence in advising and recommending an insurance program appropriate for the needs of the Yenchis), and negligent misrepresentation (e.g., that Appellants failed to disclose full, correct and material information regarding the products being offered). Complaint, 11/13/2003, ¶¶ 190-98. At oral argument on Appellants' motion for summary judgment, counsel for the Yenchis identified this claim as one for negligent misrepresentation and advised the trial court that the Yenchis had not asserted a claim for professional malpractice. N.T., 3/27/2013, at 7. The trial court did not grant summary judgment on this claim. At some point prior to trial, however, the Yenchis either abandoned or voluntarily dismissed the claim, although the case docket does not so reflect. The Yenchis raised no issues with regard to this count on appeal.

control to the insurance agent. In applying its *Ihnat* decision, the trial court rejected the notion that there was any material difference between an insurance agent and a financial advisor. The trial court further indicated that the Yenchis "knew they were dealing with a representative of American Express who was recommending purchases of American Express investments." Trial Court Memorandum, 7/28/2014, at 4. While the trial court noted that this fact may be relevant to the Yenchis' fraudulent misrepresentation and UTPCPL claims, it did not provide support for a fiduciary duty claim, since "a breach of fiduciary duty claim requires a policyholder to give up control." *Id.*

The case proceeded to trial on the Yenchis' fraudulent misrepresentation and UTPCPL claims in connection with the purchase of the 1996 whole life insurance policy. At trial, the jury returned a verdict in favor of Appellants on the fraudulent misrepresentation claim and, based upon the same evidentiary record, the trial court found in Appellants' favor on the UTPCPL claim.[4]

---

[4] The Yenchis' UTPCPL claim, like their claim for fraudulent misrepresentation, required proof of common law fraud. Their UTPCPL claim, which related to the 1996 whole life insurance policy, accrued on or around August 15, 1996, the date Mr. Yenchi purchased the policy. At that time, the catchall provision of the UTPCPL prohibited one from "engaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding." *See Prime Meats, Inc. v. Yochim*, 619 A.2d 769, 773 (Pa. Super. 1993) (quoting 73 P.S. § 201-2(4)(xvii)). On December 4, 1996, this provision was amended to prohibit one from "engaging in any other fraudulent **or deceptive** conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi) (emphasis added). *See generally Walkup v. Santander Bank, N.A.*, 147 F.Supp.3d 349, 361 (E.D. Pa. 2015).

The Superior Court affirmed the trial court's determination that the pre-amendment version of the UTPCPL applied to the Yenchis' claim, thus requiring proof of fraudulent, as opposed to merely deceptive, conduct. *Yenchi*, 123 A.2d at 1083. The Yenchis did not seek review of that ruling by this Court.

The Yenchis appealed. Among the issues presented to the Superior Court was the dismissal of the breach of fiduciary duty claim. With respect to this issue, the Superior Court agreed with the Yenchis that the trial court erred in focusing exclusively on the nature of the relationship in question (that of a buyer and seller of insurance) and the Yenchis' retention of decision-making authority over their investments. *Yenchi v. Ameriprise Fin., Inc.*, 123 A.3d 1071, 1080-81 (Pa. Super. 2015). The Superior Court acknowledged that Pennsylvania appellate courts have always considered the existence of a confidential relationship[5] to be dependent upon the facts of each particular case, as it cannot be "reduced to a catalogue of specific circumstances, invariably falling to the left or right of a definitional line." *Id.* at 1080 (citing *In re Estate of Scott*, 816 A.2d 883, 885 (Pa. 1974)). As such, the Superior Court held that the trial court's focus on the insurance aspect of the relationship in this case "eliminates wholesale an entire category of commercial relationships without properly accounting for the fact-sensitive inquiry required by our case law." *Id.* In addition, the Superior Court held that the trial court's insistence that a fiduciary relationship may be established only when one party cedes decision-making control to the other was too rigid, as prior cases have recognized fiduciary relationships upon a showing of an "over-mastering influence," and thus the standard for the establishment of a fiduciary relationship "can be met with evidence less absolute than a complete cession of decision-making authority." *Id.*

Judge Lazarus filed a dissenting opinion, indicating that the "relationship created by a commercial, arm's-length transaction" is "not ordinarily confidential by law." *Id.* at 1085 (Lazarus, J., dissenting) (citing *Wisniski v. Brown & Brown Ins. Co.*, 906 A.2d 571,

---

[5] The terms "fiduciary relationship" and "confidential relationship" may be used interchangeably. *Stewart v. Hooks*, 94 A.2d 756, 759 (Pa. 1953).

578-79 (Pa. Super. 2006)). Judge Lazarus noted that the Yenchis knew and understood that they were developing a relationship with an American Express employee who sold insurance and financial products and provided fee-based financial planning advice. *Id.* at 1085. Because the Yenchis made each decision to purchase a product from Holland, as indicated by their signatures authorizing the purchases, they never ceded decision-making authority to him. *Id.* at 1086.

This Court granted discretionary review to consider whether the Superior Court erred in reversing the decision of the trial court to grant summary judgment in favor of Appellants on the grounds that the Yenchis had not adduced sufficient evidence to establish a prima facie case that a fiduciary relationship existed between the parties. *Yenchi v. Ameriprise Fin., Inc.*, 134 A.3d 51 (Pa. 2016) (per curiam).[6] On this issue, Appellants contend that the Superior Court erred in determining that the Yenchis presented sufficient evidence to create an issue of fact as to whether a fiduciary relationship existed with Holland. Appellants argue that in connection with consumer transactions, fiduciary relationships may exist only if one party cedes decision-making control to the other party. Appellants claim that if, as the Yenchis suggest, a fiduciary relationship may be created any time one party relies upon the superior skill, knowledge or expertise of the other party, then fiduciary relationships would arguably exist in virtually every consumer transaction, including with plumbers, mechanics and salespeople. According to Appellants, no such protections are necessary, since

---

[6] We also granted allocatur with respect to an evidentiary issue, namely whether the Superior Court erred in reversing the decision of the trial court with respect to Appellants' motions in limine and granting the Yenchis' request for a new trial on their fraudulent misrepresentation and UTPCPL claims. *Yenchi v. Ameriprise Fin., Inc.*, 134 A.3d 51 (Pa. 2016) (per curiam). Upon further review of the submissions of the parties and the certified record on appeal, we have made a determination that the appeal as to this issue was improvidently granted.

consumers have available to them other tort, contract, and statutory remedies, including, in particular, the UTPCPL.

The Yenchis, conversely, argue that the Superior Court did not err, as decisions about the existence of fiduciary relationships are fact-intensive inquiries. The Yenchis contend that Appellants held themselves out as experts in financial and retirement planning matters, and that, by contrast, they had only high school educations and no experience working with a financial advisor. This substantial difference of relevant knowledge, the Yenchis insist, created a question of material fact as to whether their relationship with Holland was one so marked by dependence and inequality that it permitted him to take advantage of them. The Yenchis claim that they reasonably believed and trusted that Holland had prepared the Proposal, and later recommended the purchase of the 1996 whole life insurance policy, with their best interests in mind.

Our scope and standard of review with respect to the grant of a motion for summary judgment is as follows:

> '[S]ummary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.' *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 812 A.2d 1218, 1221 (2002); Pa. R.C.P. No. 1035.2(1). When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. *Toy v. Metropolitan Life Ins. Co.*, 593 Pa. 20, 928 A.2d 186, 195 (2007). In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment "where the right to such judgment is clear and free from all doubt." *Id.* On appellate review, then
>
> > an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as

> to any material fact presents a question of law, and therefore, on that question our standard of review is de novo. This means we need not defer to the determinations made by the lower tribunals.
>
> *Weaver v. Lancaster Newspapers, Inc.*, 592 Pa. 458, 926 A.2d 899, 902–03 (2007) (internal citations omitted). To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record. *Id.* at 903.

*Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa. 2010).

A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. Pa.R.C.P. 1035.2, Note. Pursuant to Rule 1035.2(2), a court must enter judgment in favor of the moving party whenever the non-moving party, with the burden of proof at trial, fails to produce sufficient evidence to create a genuine issue of material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. *Barnish v. KWI Bldg. Co.*, 980 A.2d 535, 543 (Pa. 2009).

In their motion for summary judgment, Appellants contended that insufficient evidence existed to create a genuine issue of material fact as to whether a fiduciary relationship existed between the Yenchis and Holland. In response, the Yenchis acknowledged that "[u]nder Pennsylvania law, typically the insurer/insured relationship is viewed as an arm's-length relationship and fails to create a fiduciary duty." Brief in Response to [Appellants'] Motion for Summary Judgment, 2/6/2013, at 20. Nevertheless, the Yenchis' contended that "the nature of the insurer/insured relationship changed and a confidential relationship was created because [Appellants] acted as a financial advisor providing investment planning advice for a fee." *Id.* In their response to the motion for summary judgment, the Yenchis cited to scant evidence in the summary judgment record in support of this claim. As evidence of their trust in Holland,

they referenced their decisions, based upon his advice, to cash out their Met Life policies and to use those proceeds to purchase the 1996 whole life insurance policy and the 1997 deferred variable annuity policy.[7]  *Id.* at 8.  The Yenchis' also referenced their lack of sophistication regarding finances or the language used in insurance policies and legal documents, although they did not cite to any particular deposition testimony or other evidence to support this claim.[8]  Finally, again without citing to any record support (including no evidence that Holland ever actually told them that he was acting in their best interests), the Yenchis claimed that "[b]y charging a fee for independent financial advice, [they were] justified in believing that the advice was being provided in their best interests, and was more than an ordinary arm's-length transaction involving the purchase of insurance."  *Id.*  Notably, in their response to the motion for summary judgment, the Yenchis did not contend, or cite to any evidence in support of, any close personal relationship with Holland.  From their deposition testimony, it would appear that all of their meetings took place either in Holland's office or over the phone.[9]

---

[7]  Although not referenced in the Yenchis' response to the motion for summary judgment, in her deposition Ms. Yenchi related that she frequently called Holland with questions after she read her monthly statement.  Motion for Summary Judgment, Exhibit 2, Deposition of Ruth Yenchi at 52-53.  She also testified that they often signed documents based upon Holland's representations with regard to their contents.  *Id.* at 48-49 ("[H]e was my advisor and I took his word.").  Mr. Yenchi likewise testified to trusting Holland.  *Id.*, Exhibit 1, Deposition of Eugene Yenchi at 145 ("[W]e trusted him that he knew the best.").

[8]  Again, while not referenced in their response to the motion for summary judgment, Mr. Yenchi testified at his deposition that he graduated from high school.  *Id.* at 9.  Ms. Yenchi did not testify regarding her educational background.

[9]  In their appellate brief filed with this Court, the Yenchis cite to testimony from Mr. Yenchi regarding his discussions with Holland, at the beginnings of their meetings, regarding a variety of topics, including golf and cigars.  Yenchis' Brief at 26 n.11.  Mr. Yenchi testified that he "would like to think he had a relationship" with Holland.  *Id.*  To the extent that this testimony could be relevant, it was offered by Mr. Yenchi at trial, and thus was not a part of the summary judgment evidentiary record.
(continued...)

A fiduciary duty is the highest duty implied by law. *Miller v. Keystone Ins. Co.*, 636 A.2d 1109, 1116 (Pa. 1994) (Cappy, J., dissenting). A fiduciary duty requires a party to act with the utmost good faith in furthering and advancing the other person's interests, including a duty to disclose all relevant information. *See Basile v. H & R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000); *Young v. Kaye*, 279 A.2d 759, 763 (Pa. 1971) ("When the relationship between persons is one of trust and confidence, the party in whom the trust and confidence are reposed must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage."); *Sylvester v. Beck*, 178 A.2d 755, 757 (Pa. 1962); *McCown v. Fraser*, 192 A. 674, 676-77 (Pa. 1937); *Null's Estate*, 153 A. 137 (Pa. 1930), *see also* Black's Law Dictionary (10th ed. 2014) (defining a fiduciary duty as "a duty to act with the highest degree of honesty and loyalty toward another person and in the best interest of the other person"). This highest duty will be imposed only where the attendant conditions make it certain[10] that a fiduciary relationship exists. *Leedom v. Palmer*, 117 A. 410, 412 (Pa. 1922) ("[T]he evidence to sustain a confidential relation must be certain; it cannot arise from suspicion or from infrequent or unrelated acts[.]"); *In re Erdeljac's Estate*, 131 A.2d 97, 100 (Pa. 1957); *In re King's Estate*, 87 A.2d 469, 472 (Pa. 1952).

In some types of relationships, a fiduciary duty exists as a matter of law. Principal and agent, trustee and cestui que trust, attorney and client, guardian and

---

(...continued)

[10] The requirement that evidence be "certain" is an early forerunner of what is now referred to a "clear and convincing" burden of proof. In some older cases, the applicable burden of proof was styled as "definite, certain, clear and convincing." *See, e.g., In re Swenk's Estate*, 108 A.2d 825, 827 (Pa. Super. 1954); *In re Culhane's Estate*, 2 A.2d 567, 572 (Pa. Super. 1938).

ward, and partners are recognized examples. *See, e.g., McCown v. Fraser*, 192 A. 674, 676-77 (Pa. 1937); *Young*, 279 A.2d at 763. The unique degree of trust and confidence involved in these relationships typically allows for one party to gain easy access to the property or other valuable resources of the other, thus necessitating appropriate legal protections.

Where no fiduciary duty exists as a matter of law, Pennsylvania courts have nevertheless long recognized the existence of confidential relationships in circumstances where equity compels that we do so. *See Darlington's Appeal*, 5 W.N.C. 529 (Pa. 1878). Our courts have found fiduciary duties in circumstances where the relative position of the parties is such that the one has the power and means to take advantage of, or exercise undue influence over, the other. The circumstances in which confidential relationships have been recognized are fact specific and cannot be reduced to a particular set of facts or circumstances. Scott, 316 A.2d at 885. We have explained that a confidential relationship "appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed[.]" *Frowen v. Blank*, 493 137, 425 A.2d 412, 416-17 (Pa. 1981). In these cases, which have typically been brought in courts of equity, if a confidential relationship was found to exist, then the burden shifts and the fiduciary has to demonstrate that there has been no breach of trust. *Id.* Transactions between persons occupying a confidential relationship are voidable, and the party seeking to benefit from such a transaction must demonstrate that his or her actions were at all times "fair, conscientious, and beyond the reach of suspicion." *Young*, 279 A.2d at 766; *Matter of Estate of Evasew*, 584 A.2d 910, 913 (Pa. 1990).

While cases involving fiduciary relationships are necessarily fact specific, they usually involve some special vulnerability in one person that creates a unique opportunity for another person to take advantage to their benefit. This Court has recognized that while disease or advancing age "do not by themselves create a confidential relationship with another," such limitations "may support an inference of confidentiality" if they bear on a party's "capacity to understand the nature of the transaction in question." *Scott*, 316 A.2d at 886. Family relationships or close personal friendships, while also not dispositive of the existence of a confidential relationship, have also often played significant roles in particular determinations. *Silver v. Silver*, 219 A.2d 659, 662 (Pa. 1966) (stating that kinship, while not dispositive, is a factor "which cannot be ignored").

Where one party lacks the ability to understand the nature and terms of the transaction and simultaneously reposes their complete trust in the other party based upon well-established relationships, this circumstance provides an opportunity for the second party to exercise undue influence over the first and, thus, effectively control the decision-making process to their advantage. In *Frowen*, for example, the sale of a farm for an unreasonably low price was set aside after recognition of a confidential relationship between, on the one hand, an elderly and infirm eighty-six-year-old widow with little formal education and, on the other, neighbors who had befriended her. *Frowen*, 425 A.2d at 415-16. Similarly, in *Brooks v. Conston*, 51 A.2d 684 (Pa. 1947), after the unexpected death of her husband, a widow with no experience in business matters agreed to sell the family's business assets, at an unfair price, to a "warm family friend" who advised her to do so without any appraisal of their value. *Id.* at 687-88.

Undue influence resulting in a loss of control has also been found to exist when one party places their complete and unhesitating trust in the other party, and in so doing

effectively cedes their decision-making authority to the other party. In *Young*, for example, an octogenarian (Young) with no knowledge of the intricacies of state and federal tax laws, effectively ceded control of the financial aspects of the corporation he owned to someone (Brooks) he considered to be a close friend and trusted advisor. *Young*, 279 A.2d at 761. Young routinely signed, unquestioningly, corporate (and individual) income tax returns, corporate financial statements, and other corporate letters and financial documents, all prepared by Brooks. *Id.* After the IRS issued a deficiency assessment against the corporation, Brooks advised Young that the assessment could be avoided if he transferred all of his shares in the corporation to him (Brooks) "for tax purposes only." *Id.* Relying solely on Brooks' advice, Young signed a certificate transferring all 10,000 shares of the corporation to Brooks, which Brooks then sold to a third party for $50,000. *Id.* This Court held that the transfer of the stock to Brooks was not an arm's-length transaction, as Young's overwhelming reliance on Brooks' tax advice created a situation in which Brooks had a unique opportunity to take advantage of Young. *Id.* at 763. We accordingly reversed the equity court's decision, voided the Young-to-Brooks transaction, and held that Young had a superior claim to the stock than did the third party. *Id.* at 760.

Conversely, even where special vulnerabilities exist, this Court has not recognized the existence of a confidential relationship if the person continued to act on his or her own behalf and did not succumb to any "overmastering influence" of another. For instance, in *Jenne v. Kennedy*, 109 A.2d 307 (Pa. 1954), this Court refused to void the sale of a house by an eighty-five year old mother to her daughter, concluding that there was not "the slightest shred of testimony that she was overpowered, dominated, or unduly influenced in her judgments by this defendant." *Id.* at 309. In *Scott*, we found no confidential relationship existed between a sister and her brother, even though the

sister, while in intensive care, had signed a bank card giving her brother access to her funds. He also later sold her car. *Id.* at 885-86. This Court determined that even during her infirmity, she continued to manage her own affairs and knowingly directed her brother's actions on her behalf, thus negating any possibility of a confidential relationship. *Id.* at 886 ("Mrs. Scott's mental powers were undiminished during the time she was in intensive care."). And in *In re Estate of Dunlap*, 370 A.2d 314 (Pa. 1977), this Court found that no confidential relationship existed between a father and son where the evidence showed that the father conducted his own banking business and executed the codicil to his will in his son's absence. *Id.* at 317 ("appellant's evidence describes an individual independently handling his own affairs").

The Superior Court, in the case before us, erred in relying on our case law involving undue influence to support its conclusion that a fiduciary relationship can be established without evidence that decision-making power was effectively ceded to another. *Yenchi*, 123 A.3d at 1080-81. Its view misses the point that the exercise of undue influence, at its core, indicates that an individual so influenced has lost the ability to make an independent decision.

In the present case, the Yenchis do not claim that Appellants' roles as sellers of insurance or, more generally, as financial advisors, created a fiduciary relationship as a matter of law. The Superior Court did not so hold. *Yenchi*, 123 A.3d at 1080 ("To be clear, we do not hold that evidence of [Appellants'] purported positions as financial advisors is sufficient by itself to establish a confidential relationship."). Moreover, while the Yenchis indicate that they paid a fee for the financial advice received from Holland, they do not contend that this fact alone creates a fiduciary relationship. Answer to Petition for Allowance of Appeal, 12/29/2015, at 9 ("It is understood that a fiduciary relationship does not arise simply because one party relies and pays for specialized

knowledge of the other party."). Instead, the Yenchis claim that a confidential relationship existed with Holland because he held a "vastly superior" position to them with respect to his knowledge of insurance products and financial services, and that over time, they came to trust him and repose confidence in his advice to them. *Id.* at 10. The Yenchis highlight the fact that they are only "high school educated" while Holland is "college educated with a CPA and securities and insurance licenses." *Id.*

We conclude that the Yenchis' summary judgment evidentiary record falls far short of establishing a fiduciary relationship with Holland. Fiduciary duties do not arise "merely because one party relies on and pays for the specialized skill of the other party." *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 23 (Pa. Super. 2003). If this were the law in Pennsylvania, "a fiduciary relationship could arise whenever one party had any marginal greater level of skill and expertise in a particular area than another party." *Id.*; *see generally Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 522 (6th Cir. 1999) ("To hold otherwise would impose fiduciary obligations on the seller of goods or services in the vast multitude of ordinary arm's-length transactions simply on the basis that the seller possessed superior knowledge of the product being sold.").

The superior knowledge or expertise of a party does not impose a fiduciary duty on that party or otherwise convert an arm's-length transaction into a confidential relationship. In this regard, the analysis is no different in a consumer transaction than in other fiduciary duty cases decided by this Court. "[T]he critical question is whether the relationship goes **beyond** mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side," which results in the effective ceding of control over decision-making by the party whose property is being taken. *eToll, Inc.*, 811 A.2d at 23 (emphasis in original) (holding that although an advertising company

was a "trusted advisor" to a software developer, no fiduciary relationship existed between the parties) (citing *Basile v. H & R Block*, 777 A.2d 95, 101 (Pa. Super. 2001)). A fiduciary duty may arise in the context of consumer transactions only if one party **cedes decision-making control to the other party**. As we indicated in *Scott*, "a business transaction may be the basis of a confidential relationship only if one party surrenders substantial control over some portion of his affairs to the other." *Scott*, 316 A.2d at 886; *see also Valley Forge Convention & Visitors Bureau v. Visitor's Services, Inc.*, 28 F.Supp.2d 947, 953 (E.D. Pa. 1998) ("There is a crucial distinction between surrendering control of one's affairs to a fiduciary or confidant or party in a position to exercise undue influence and entering an arm's-length commercial agreement[.]").

The case at bar presents an arm's-length consumer transaction in which the Yenchis accepted Holland's advice with respect to the purchase of the 1996 whole life insurance policy. The Yenchis made the decision to purchase this policy, but also decided to reject other proffered products and services. While we recognize that the premium structure and payout terms of the 1996 whole life insurance policy were complicated, that fact does not change the character of the transaction in question. The Yenchis purchased an insurance product from a captive financial advisor with whom they had a business relationship for a little more than a year, initiated by a cold-call. The Yenchis' lack of post-secondary high school educations is not indicative of a weakness, dependence, or trust, justifiably reposed, nor is Holland's advanced training sufficient to establish an overmastering influence.

The record here establishes that the Yenchis made the decision to purchase Appellants' advice and financial products. Reliance on another's specialized skill or knowledge in making the purchase, without more, does not create a fiduciary relationship. We acknowledge that the Yenchis may have become comfortable with the

Appellants' expertise before deciding to purchase the 1996 whole life insurance policy, which is to be expected when making a financial decision. It is part of the development of any business relationship -- consumer or otherwise. It does not, however, establish a fiduciary relationship. There is no evidence to establish that the Yenchis were overpowered, dominated or unduly influenced in their judgment by Holland.

The Yenchis never ceded any decision-making authority to Holland. Over the course of the relationship, they followed some of his recommendations and rejected others. Prior to the proposal for the whole life policy at issue, Appellants proposed a different whole life product that the Yenchis did not purchase. As to advice accepted, the Yenchis purchased the 1996 whole life insurance policy and the 1997 deferred variable annuity. They began saving money in an investment certificate and opened an IRA account. On the other hand, they rejected other recommendations, including, in particular, Holland's advice in 1998 to increase their life insurance to the $300,000 level, deciding for themselves that the 1996 whole life policy was a sufficient amount of life insurance for their needs.[11] The evidence does not establish that the Yenchis were subject to any overmastering influence by Holland. They maintained and exercised decision-making control over their financial matters. No confidential relationship was ever created.

---

[11]     Q.     Do you recall there being a time that [Holland] proposed to you the possibility of buying more insurance?

       A.     We said no.

       Q.     Why is it that you said no at that time?

       A.     We thought we had enough insurance ....

Motion for Summary Judgment, Exhibit 2, Deposition of Ruth Yenchi at 60-61.

We note that under current law and appropriate facts, consumers have various common law tort remedies (with burdens of proof less stringent than those required in fiduciary duty cases), as well as claims for common law fraud and the statutory relief provided by the current version of the UTPCPL, which provides a remedy for deceptive conduct. 73 P.S. § 201-2(4)(xxi). We decline to modify the law of fiduciary duty to encompass the particular pitfalls involved in the sale of insurance products by commissioned agents or financial advisors to less savvy customers.[12] Moreover, we do not hold that a fiduciary duty cannot arise in a case with facts not present here, but absent evidence that a consumer of financial services and goods cedes control over the decision to purchase, either explicitly or implicitly because of over-mastering or undue influence, no fiduciary relationship arises. Because the Yenchis have not adduced facts sufficient to establish the indicia of a fiduciary relationship, we must reverse the Superior Court's decision to reverse the trial court's grant of summary judgment on this issue.

For these reasons, we reverse the order of the Superior Court in part, as it pertains to the issue of fiduciary duty. The balance of the present appeal is dismissed as improvidently granted, and accordingly, the remainder of the Superior Court's order remains intact.

---

[12] In their appellate brief, the Yenchis argue that the United States Supreme Court has recognized that the Investment Advisors Act of 1940, 15 U.S.C. § 40b-6, creates fiduciary obligations for registered financial advisors to act in the best interest of those they advise. Yenchis' Brief at 38 (citing *S.E.C. v. Capital Gains Research Bureau*, 375 U.S. 180, 187 (1963)). As Appellants correctly note, however, this ruling and legislation have no application here, as the present case does not involve advice regarding the purchase of securities. These laws, however, illustrate the manner in which legislative enactments can police an industry. We decline to make a change to the common law of fiduciary duty with respect to an entire industry. Such a sweeping change should be left to the Legislature, based upon its consideration of the various policy concerns and the financial implications of regulations on consumers and the industry.

Chief Justice Saylor and Justices Baer and Dougherty join the opinion.

Justice Todd files a dissenting opinion in which Justice Wecht joins.

Justice Mundy did not participate in the consideration or decision of this case.