J-A10027-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| KATHERINE M. PURCELL | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CAROLE CAPLES | : | No. 1818 EDA 2023 |

Appeal from the Judgment Entered June 21, 2023
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2019-C-1929

| | | |
|---|---|---|
| CAROLE LEE CAPLES | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KATHERINE M. PURCELL | : | No. 1963 EDA 2023 |

Appeal from the Judgment Entered June 21, 2023
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2021-C-2083

| | | |
|---|---|---|
| KATHERINE M. PURCELL | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| CAROLE CAPLES | : | |
| | : | |
| Appellant | : | No. 1964 EDA 2023 |

Appeal from the Judgment Entered June 21, 2023
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2019-C-1929

| | | |
|---|---|---|
| CAROLE LEE CAPLES | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |

J-A10027-25

|                          |   |                |
|--------------------------|---|----------------|
|                          | : |                |
| v.                       | : |                |
|                          | : |                |
|                          | : |                |
| KATHERINE M. PURCELL     | : |                |
|                          | : |                |
| Appellant                | : | No. 1210 EDA 2024 |

Appeal from the Judgment Entered June 21, 2023
In the Court of Common Pleas of Lehigh County
Civil Division at No(s):  2021-C-2083

BEFORE:   PANELLA, P.J.E., BECK, J., and FORD ELLIOTT, P.J.E.[*]

DISSENTING MEMORANDUM BY PANELLA, P.J.E.:

**FILED NOVEMBER 14, 2025**

As I find the majority applied the wrong standard of review, I write to note my strong dissent to the majority's decision to impose its reevaluation of the factual record, reverse the judgment entered in favor of Caples and against Purcell, and the majority's direction to the trial court to enter judgment notwithstanding the verdict ("JNOV") in favor of Purcell.

Notably, "[t]he entry of [JNOV] is a drastic remedy. A court cannot lightly ignore the findings of a duly selected jury." ***A.Y. v. Janssen Pharmaceuticals, Inc.***, 224 A.3d 1, 12 (Pa. Super. 2019) (citation and ellipses omitted).

> A motion for judgment [NOV] is a post-trial motion which requests the court to enter judgment in favor of the moving party. There are two bases on which the court can grant [JNOV]:

---

[*] Retired Senior Judge assigned to the Superior Court.

- 2 -

One, the movant is entitled to judgment as a matter of law, and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that **even with all factual inferences decided adverse[ly] to the movant** the law nonetheless requires a verdict in his favor; whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

**In an appeal from the trial court's decision to deny [JNOV],**

**we must consider the evidence, together with all favorable inferences drawn therefrom, in the light most favorable to the verdict winner.** Our standard of review when considering motions for a directed verdict and [JNOV] are identical. We will reverse a trial court's grant or denial of a [JNOV] only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.

Concerning any questions of law, our scope of review is plenary. **Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact**…. **A JNOV should be entered only in a clear case.**

*Id.* at 11-12 (citations and quotation marks omitted; emphases added). Upon review of the majority decision, I find the majority erred by failing to properly review the evidence of record in a light most favorable to Caples, as the verdict winner. I must therefore dissent.

Here, the jury determined that Caples proved her claim for breach of fiduciary duty against Purcell regarding disposition of the proceeds from the sale of the Whitehall Property, and entered a verdict in Caples' favor.

- 3 -

Purcell subsequently filed a motion for post-trial relief, arguing, in relevant part, that JNOV should be entered in favor of Purcell and against Caples on Caples' breach of fiduciary duty claim based on the disposition of the proceeds from the sale of the Whitehall Property given the absence of a fiduciary duty owed by Purcell to Caples, and because there is no basis for a breach of fiduciary duty claim to contradict the assumption of joint ownership arising from the joint-titling of the Whitehall Property. **See** Purcell's Motion for Post-Trial Relief, 2/9/23, at 2-7.

The trial court denied the motion for post-trial relief. Importantly, the trial court noted "Purcell proffers the [JNOV] request as a matter of law and not as a failure to meet the evidentiary standard for a breach of fiduciary." Trial Court Opinion, 6/16/23, at 23. This is true, as in all of Purcell's issues related to breach of fiduciary duty, Purcell is critical of whether a fiduciary duty existed as a matter of law.

The trial court concluded "the vast majority of the testimony presented at trial regarding the history of dealings between Purcell and Caples, leads this court to the conclusion that there could be no doubt that there existed a fiduciary relationship between Purcell and Caples." **Id.** at 28. Accordingly, the

court concluded Purcell was not entitled to judgment as a matter of law as the jury's verdict was supported by the record.[1] *See id.*

In concluding JNOV is warranted, despite the findings of the jury and the trial court, the majority continually uses language that "we find no support for the trial court's decision" and "[t]here is simply no basis in the record." Majority Memorandum, at 25. The majority makes these bold statements after reiterating all of the evidence presented at trial, mainly focusing on Purcell's testimony, and mostly only through the lens of Purcell's role as her mother's power of attorney ("POA"). The majority consistently refers to Purcell's testimony, and accepts that testimony as fact, contrary to the jury's factual and credibility findings, and contrary to our standard of review, which requires we view the facts adversely to the movant, and in the light most favorable to the verdict winner. *See A.Y.*, 224 A.3d at 11. The majority then "conclude[s] that the trial court erred in finding that Purcell breached a fiduciary duty to Caples." Majority Memorandum, at 22.

Notably, this was not a bench trial. The jury was the fact-finder in this case, and as such, was ultimately responsible for the finding that Purcell

---

[1] "[A trial] judge's appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations." *Estate of Hicks v. Dana Companies, LLC*, 984 A.2d 943, 951 (Pa. Super. 2009). With this standard in mind, as aforesaid, the experienced trial judge in this case denied the motion for JNOV.

breached a fiduciary duty to Caples. The trial court's only role was to decide whether the jury's finding was incorrect as a matter of law, as that was the avenue pursued by Purcell in requesting JNOV. With a request for JNOV on the first basis—as a matter of law— "the court reviews the record and concludes that even with all factual inferences decided adverse[ly] to the movant the law nonetheless requires a verdict in his favor." **A.Y.**, 224 A.3d at 11 (citation omitted). This is not the standard the majority followed.

The majority appears to re-evaluate the evidence, crediting a substantial amount of testimony from Purcell, while choosing to discredit the testimony of Appellees. **See, e.g.**, Majority Memorandum, at 25 (crediting Purcell's testimony, while ignoring the testimony of Caples, D'Allessandro, and Cullen that it was known that Purcell's name on the deed was only for estate purposes). This is simply not our role as appellate court. It is often the case that there is evidence that could support either outcome in a matter. As an appellate court, we are not tasked with looking at the evidence and inserting what we would have decided based on that evidence. Rather, we are only tasked with determining if there is *any* evidence to support the verdict.

Upon application of the proper standard of review, I conclude the trial court properly found that the evidence adduced in this case, giving all reasonable inferences to Caples as the verdict winner, is more than sufficient to support the jury's finding that Purcell owed a fiduciary duty to Caples and that Purcell breached that duty.

The trial court found Purcell's arguments were "fundamentally flawed," because Purcell only asserted that no fiduciary duty was owed by Purcell to Caples since Purcell was not acting as Caples' agent and not exercising powers as POA at the time that the Whitehall Property was sold. Trial Court Opinion, 6/16/23, at 23.

Importantly, our Supreme Court, in **Yenchi v. Ameriprise Financial, Inc.**, 161 A.3d 811 (Pa. 2017), as cited by the trial court, has explained that a fiduciary duty can arise in a few different circumstances, including *but not limited to* between a principal and agent:

> A fiduciary duty is the highest duty implied by law. A fiduciary duty requires a party to act with the utmost good faith in furthering and advancing the other person's interests, including a duty to disclose all relevant information. This highest duty will be imposed only where the attendant conditions make it certain that a fiduciary relationship exists.
>
> In some types of relationships, a fiduciary duty exists as a matter of law. Principal and agent, trustee and cestui que trust, attorney and client, guardian and ward, and partners are recognized examples. The unique degree of trust and confidence involved in these relationships typically allows for one party to gain easy access to the property or other valuable resources of the other, thus necessitating appropriate legal protections.
>
> **Where no fiduciary duty exists as a matter of law, Pennsylvania courts have nevertheless long recognized the existence of confidential relationships in circumstances where equity compels that we do so.** Our courts have found fiduciary duties in circumstances where the relative position of the parties is such that the one has the power and means to take advantage of, or exercise undue influence over, the other. **The circumstances in which confidential relationships have been recognized are fact specific and cannot be reduced to a particular set of facts or circumstances.** We have explained that a confidential relationship "appears when the circumstances

make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed[.]" …

While cases involving fiduciary relationships are necessarily fact specific, they usually involve some special vulnerability in one person that creates a unique opportunity for another person to take advantage to their benefit. This Court has recognized that while disease or advancing age "do not by themselves create a confidential relationship with another," such limitations "may support an inference of confidentiality" if they bear on a party's "capacity to understand the nature of the transaction in question." Family relationships or close personal friendships, while also not dispositive of the existence of a confidential relationship, have also often played significant roles in particular determinations.

*Yenchi*, 161 A.3d at 819-821 (citations and footnotes omitted) (emphases added). Accordingly, while the jury could have found that a fiduciary duty existed based on Purcell's role as her mother's agent under the POA, that relationship was not dispositive. The jury also could have found that Purcell and Caples were in a confidential relationship.

Notably, the test for a confidential relationship is disjunctive, needing only one of the following to show an unfair advantage: (1) overmastering influence, (2) weakness, (3) dependence, *or* (4) trust. *See Basile v. H & R Block, Inc.*, 777 A.2d 95, 101 (Pa. Super. 2001).

Upon reviewing the record, I commend the trial court on its thorough recitation of the facts in this case, which properly laid out the record in the light most favorable to the verdict winner, as we must. *See* Trial Court Opinion, 6/16/23, at 3-10.

Viewing the record in this manner, there was testimony presented that it was understood by all, including Purcell, that Caples placed Purcell's name on the deed for the Whitehall Property because it was a family practice, and Caples expected this would help facilitate Purcell evenly dividing the house between the three daughters in the event their mother moved or passed away. *See* N.T., Jury Trial, 1/27/23, at 52 (Caples testifying that she put Purcell's name on the deed because her late husband had told her to put somebody else—one of the girls—on the deed if she were ever going to buy a house alone; and that she placed Purcell on the deed with the intent that if Caples were to pass away while still owning the house, Purcell would divide the property evenly between all three sisters); *see also* N.T., Jury Trial, 1/26/23, at 106 (D'Allesandro testifying, "Our understanding was that [Purcell] would be able to take care of the selling of the home and attributing the funds to Mom's estate. Where they would be divided equally … That's what everyone's understanding was."); *see also* N.T., Jury Trial, 1/27/23, at 117 (Cullen testifying about a specific phone call with Purcell where "[Purcell] had mentioned or had—was telling me on the phone that her and Mom decided to put [Purcell]'s name on the 5th Street property. For inheritance tax purposes. I didn't really understand it at that time. But to make it easier to sell the house and disburse the funds if something, God forbid, were to happen to my mom."); *see also id.* at 119-120 (Cullen testifying that Purcell said "[t]hat if Mom owned the property by herself and she were to pass away, that the

- 9 -

government would take a chunk of the money in inheritance tax, and it would get tied up in court and her beneficiaries would receive less. It would be more streamlined if she was on the property. And then she could sell the home and split the proceeds between my mom's children … The way Mom always wanted. A third to each of us."). It is clear the jury accepted and credited this testimony as true.

The trial evidence shows that Purcell was involved in listing the Whitehall Property for sale, selected the real estate agent of her choosing, and signed the listing agreement as Caples' agent under the POA. *See* N.T., Jury Trial, 1/25/23, at 224 (D'Alessandro testifying that they tried to list the house "for sale by owner", that Caples wanted a particular real estate agent, but Purcell rejected that agent and used her own agent). Purcell was also the only daughter involved in the settlement.

Trial testimony showed that Caples believed she had paid part of the loan back to Purcell with half of the proceeds from the sale of the Whitehall Property, i.e. that Purcell used the proceeds from the sale to repay the loan. *See* N.T., Jury Trial, 1/27/25, at 60-61. However, Purcell took this money with no credit to Caples nor to her sisters. This is despite the fact that Purcell had no personal investment in the property that had been sold. While Purcell had originally advanced money to Caples to purchase the property, that money was immediately paid back with the proceeds of Caples' Maryland home. After

that, Caples paid all bills and utilities for the home. Purcell never resided at the Whitehall Property and never paid any bills or utilities related to the home.

Purcell's son also admitted that he had told his aunt, D'Alessandro, that the proceeds his mother received from the sale of the Whitehall Property would be used for the benefit of his grandmother, and that this was based on conversations he had with his mother on that subject. *See* N.T., Jury Trial, 1/27/23, at 92-93. Despite this, Purcell kept the money for her own benefit. Of course, this testimony was also before the jury.

The above testimony provided at trial, construed in favor of Caples as the verdict winner, showed that Caples never intended to give proceeds of the sale of the house to Purcell, and that Purcell's name on the deed was only for estate purposes to facilitate splitting everything evenly between the three children. The evidence, read in light of the verdict winner, shows there was no intention of a gift to Purcell.

Evidence was also presented that Caples suffered from a weakened intellect during the relevant time frame. *See* N.T., Jury Trial, 1/25/23, at 183-187 (Dr. Daniel M. Spatz, Jr. testifying regarding Caples being a patient of his for around four years, including the time between December 2017 and February 2019, and the concerns about her memory that persisted during that time); *see also* N.T., Jury Trial, 1/27/23, at 126-128 (Cullen testifying about a time in late March of 2018 where Caples had become disoriented while driving to see a friend and Purcell had to go get Caples and her car off the

side of the road and take her to the hospital, where Caples was treated for sepsis and pneumonia; it was after this hospitalization, her second, that the sisters discussed Caples moving into Fellowship Community); *see also id.* at 138 (testimony that during a doctor's appointment on October 27, 2018, Caples was diagnosed with Alzheimer's, late onset without behavioral disturbance, and that Purcell had called Cullen crying after the diagnosis); *see also id.* at 138-139 (testimony presented regarding Caples' declining mental health in the months leading up to that appointment, from February to October of 2018; Cullen testifying she noticed Caples was having trouble remembering things, like "Remembering to take her medicine. Remembering to eat. Getting lost a little bit."); *see also* N.T., Jury Trial, 1/23/25, at 109-111 (Purcell testifying about times in 2017 and into 2018 where she thought her mom was forgetting things or her memory was not reliable). Further, Robert M. Gordon, Ph.D. testified extensively as an expert witness regarding his review of Caples' medical records and the report he completed in which he concluded Caples suffered from a weakened intellect. *See e.g.,* N.T., Videotaped Deposition of Robert M. Gordon, Ph.D., 9/8/22, at 37-38 (Dr. Gordon testifying regarding the expert report he completed in which he concluded it is clear Caples was of weakened intellect during the period of time between May 2018 to October 2018); *see also* N.T., Jury Trial, 1/26/25, at 184-185 (Dr. Gordon's videotaped deposition being played into the record).

Trial testimony further shows that Caples was confused by most of the financial matters of which Purcell was helping, and that she was relying on her trust in Purcell to take care of those matters in the way that she wished. **See** N.T., Jury Trial, 1/27/23, at 64 (Caples testifying she was confused by the promissory note paperwork for the $192,850 loan from Purcell, and she "wasn't sure what was going where, the $92,000 and the $469" but signed the paperwork at Purcell's direction because she did not want to argue about it, and *trusted* Purcell); **see also id.** at 56-57 (Caples intended to repay the loan as soon as she could—as soon as her house sold—and stated "I was pretty fast in repaying her."); **see also id.** at 58 (Caples affirming she expected to receive all of the proceeds from the sale of her home and that Purcell never mentioned being entitled to half of the proceeds); **see also id.** at 66 (Caples again affirming she had placed her trust in Purcell when naming her as her agent).

The testimony presented regarding Caples' confusion over the financial matters Purcell took care of for her, her unequivocal placement of trust in Purcell to take care of those matters on Caples' behalf, and testimony regarding Caples' diminishing memory, disorientation, and Alzheimer's diagnosis, were sufficient to show the undue influence or trust needed in a confidential relationship. This, along with evidence showing that Purcell was controlling financial matters for Caples, was sufficient to prove a confidential relationship existed between Caples and Purcell.

While Purcell attempted to rebut this argument, she appears to have continuously confused undue influence with testamentary capacity. ***See, e.g.***, N.T, Jury Trial, 1/23/25, at 126-30 (Purcell's attorney making much of the fact that Caples' wills and other estate planning documents were signed off as Caples being of sound mind.).

"The weakened intellect necessary to establish undue influence need not amount to testamentary incapacity." ***In re Estate of Schumacher***, 133 A.3d 45, 52 (Pa. Super. 2016) (***citing In re Estate of Clark***, 334 A.2d 628, 634 (Pa. 1975)). "Weakened intellect in the context of a claim of undue influence … will generally be proven through evidence more remote in time from the actual date of the will's execution." ***In re Bosley***, 26 A.3d 1104, 1111 (Pa. Super. 2011). "Although our cases have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation." ***Owens v. Mazzei***, 847 A.2d 700, 707 (Pa. Super. 2004) (citations omitted).

Upon review of the record, I find the jury's verdict is supported by sufficient evidence that Caples was in mental decline during the relevant time period. Multiple witnesses, including Caples' daughters and treating physician, testified to Caples' declining memory and confusion during the months leading up to and after the sale of the Property. Their recollections, which the jury was able to weigh in their role as fact-finder, were more than sufficient to

show that Caples was experiencing a mental decline, ultimately leading to an Alzheimer's diagnosis, and that her declining mental state was apparent, not only to her doctor, but to all family members who had signification contact with her during that time.

Purcell's argument to the contrary, which relies exclusively on Caples being of sound mind to sign an estate planning document (i.e. testamentary capacity), and which is essentially a challenge to the witnesses' credibility, falls markedly short of demonstrating evidentiary insufficiency, and certainly not an error of law.

Finally, the record includes more than sufficient evidence to find a breach of a fiduciary duty granted under the POA. The record shows that Purcell accepted appointment as Caples' POA, signing acknowledgments on May 21, 2018, and again on October 11, 2018. **See** N.T., Jury Trial, 1/24/23, at 219; **see also** N.T., Jury Trial, 1/25/23, at 20-21. Once Purcell signed the agent acknowledgements to be Caples' POA, there were automatic duties imposed on Purcell. Generally, "an agent that has accepted appointment [under a POA] shall: (1) Act in accordance with the principal's reasonable expectations to the extent actually known by the agent and, otherwise, in the principal's best interest. (2) Act in good faith. (3) Act only within the scope of authority granted in the [POA]." 20 Pa.C.S.A. § 5601.3(a).

In addition, an agent appointed under a POA has the following duties:

(1) Act loyally for the principal's benefit.

(1.1) Keep the agent's funds separate from the principal's funds unless:

(i) the funds were not kept separate as of the date of the execution of the power of attorney; or

(ii) the principal commingles the funds after the date of the execution of the power of attorney and the agent is the principal's spouse.

(2) Act so as not to create a conflict of interest that impairs the agent's ability to act impartially in the principal's best interest.

(3) Act with the care, competence and diligence ordinarily exercised by agents in similar circumstances.

(4) Keep a record of all receipts, disbursements and transactions made on behalf of the principal.

(5) Cooperate with a person who has authority to make health care decisions for the principal to carry out the principal's reasonable expectations to the extent actually known by the agent and, otherwise, act in the principal's best interest.

(6) Attempt to preserve the principal's estate plan, to the extent actually known by the agent, if preserving the plan is consistent with the principal's best interest based on all relevant factors, including:

(i) The value and nature of the principal's property.

(ii) The principal's foreseeable obligations and need for maintenance.

(iii) Minimization of taxes, including income, estate, inheritance, generation-skipping transfer and gift taxes.

(iv) Eligibility for a benefit, program or assistance under a statute or regulation.

20 Pa.C.S.A. § 5601.3(b).

Purcell argues that she did not sign anything as an agent, other than the listing agreement for the Whitehall Property. However, as made clear above, our law does not require a signature as the only way to act as an agent. For example, an agent can also make deposits, transfer money, draft documents, and order the principal to sign documents or take certain actions. Other than simply signing something, the record establishes many instances where the jury could have concluded that Purcell "acted" as Caples' agent.

Purcell argues that the transactions at issue were independent from her role as agent under the POA, and she therefore did not have a fiduciary duty in relation to those transactions. I do not find anything independent about these transactions, as they all involve a financial benefit to Purcell, and a financial detriment for Caples. Said another way, while having the POA, Purcell was controlling financial transactions on Caples' behalf and receiving major financial benefits. Broken down, out of the $262,519,75 net proceeds from the sale of the Property, Purcell received the following benefits:

- $131,259.88, constituting half of the proceeds, was given directly to Purcell at settlement

- $100,000, was given to Purcell from Caples at Purcell's direction

- $31.67, constituting half of Caples' sewer bill refund, was given to Purcell, despite the fact that Purcell never paid any of the sewer bills for the Property

- 5 monthly transfers of $469.71, were paid by Purcell to herself, on behalf of Caples, from a joint account Purcell shared with her mother (the "8699 Account")

- $28,528.39, was transferred by Purcell from the 8699 Account to a personal account that she shared with her husband

*See* N.T., Jury Trial, 1/25/23, at 58. After subtracting the above amounts, Purcell received all but $351.26 of the proceeds from the sale of her mother's house. *See id.* (Purcell affirming the above amounts and financial benefit from the proceeds). These amounts totaled over $250,000, despite Purcell only being owed a total of $192,850.

It is undisputed that Caples borrowed $192,850 from Purcell for her entrance fee to Fellowship Community. The original loan agreement for repayment was for monthly payments of $975.60, for 240 months, starting on November 1, 2018.

On October 18, 2018, both Caples and Purcell each received a check for $131,259.88 from the sale of the Whitehall Property.

On November 24, 2018, Purcell invited Caples to her home and directed Caples to write two checks: one for $100,000 to go towards the loan, and another for $30,850 to go into an account shared by Purcell and Caples (the "8699 Account"), to go towards monthly payments on the loan. *See* N.T., Jury Trial, 1/24/23, at 142 (Purcell admitting in her testimony that after depositing the funds into the 8699 Account, she was the one who scheduled the monthly

payments); ***see also id.*** at 184 (Purcell testifying she told Caples the money would be used for monthly payments so Caples would not have to pay it monthly herself).

However, on January 20, 2019, Purcell, of her own accord, and without Caples asking her to, removed $28,528.39 of the $30,850 deposit from the 8699 Account, and placed it in a personal account that Purcell shared with her husband, which earned dividends and interest. ***See*** N.T., Jury Trial, 1/25/23, at 35-36. Subsequently, on February 7, 2019, March 7, 2019, and April 7, 2019, Purcell made monthly transfers of $469.71 from the 8699 Account to her personal account she shared with her husband. ***See*** Exhibit D-47. On April 7, 2019, due to a low balance in the 8699 Account, Purcell transferred $469.71 from her personal account into the 8699 Account, and then transferred the same amount back. ***See*** Exhibit D-51.

In the meantime, on February 21, 2019, Caples had revoked Purcell's POA and appointed D'Alessandro and Cullen as POA. Nevertheless, Purcell continued to exert control over Caples' funds in the 8699 Account by making the March and February payments.

The above transactions were all directed by Purcell and are examples of Purcell controlling Caples' money, and not allowing Caples power over her own funds. As noted by the trial court, this was all being done while Purcell was ignoring D'Alessandro and Cullen's requests for information about the loan, and while Purcell was acting as POA over Caples.

I reiterate, our standard of review here compels us to view the evidence "in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor." **A.Y.**, 224 A.3d at 11 (citation omitted). I further reiterate that "[c]oncerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact", i.e. the jury. **Id.** at 12 (citations omitted). As such, similar to the trial court, I have focused mainly on the testimony of witnesses other than Purcell, with very limited references to Purcell's testimony, as it is clear Purcell's testimony was rejected by the jury in relation to this verdict.

Upon review of the record, and the comprehensive findings of the trial court, I find the jury's verdict is supported by compelling, indeed overwhelming, evidence. The testimony of Caples, D'Allessandro, and Cullen, which the jury was able to weigh in their role as fact-finder, and which the trial court found to be reliable after having sat through the entire trial, was more than sufficient to show a fiduciary duty existed between Caples and Purcell, whether through the existence of a confidential relationship and/or through Purcell's role as her mother's POA.

Additionally, I would affirm the trial court's findings on the remaining issues on the basis of the very thorough and well-written trial court opinion. **See** Trial Court Opinion, 6/16/23, at 21-48.

In light of these conclusions, I would affirm the judgment entered in favor of Caples and against Purcell, as there is clearly more than *some* evidence to support the jury's finding.