J-A04034-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF: MARIAN D. TOTH AN INCAPACITATED PERSON | : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J. GEZA TOTH | | |
| | | No. 1517 EDA 2018 |

Appeal from the Order May 8, 2018
In the Court of Common Pleas of Chester County Orphans' Court at
No(s):  No. 1516-0190

BEFORE:   LAZARUS, J., KUNSELMAN, J., and COLINS*, J.

MEMORANDUM BY COLINS, J.:                    **FILED APRIL 05, 2019**

Appellant, Jerry Geza Toth, appeals, *pro se*, from an order entered by the Court of Common Pleas of Chester County, Orphans' Court Division granting in part an emergency petition filed by the guardian of Appellee, Marian D. Toth (Marian or Appellee), and permitting the guardian to transfer property owned by Marian (the Property) to Marian's daughter-in-law, Gabriella Toth (Gabriella).[1]  We affirm the orphans' court order and deny a motion filed by Appellee to dismiss this appeal as moot.[2]

---

[1] The emergency petition was entitled in full "Emergency Petition for Leave to Settle or Compromise Action and Approval of Sale and Transfer of Real Estate Involving an Alleged Incapacitated Person" and also sought approval from the orphans' court for the sale of a vacant lot owned by Marian and to settle litigation with a previously evicted tenant at the Property.  These other issues are not presently before us.

[2] Appellee filed the motion to dismiss on August 2, 2018.  In a September 7, 2018 *per curiam* order, this Court denied the motion without prejudice for Appellee to raise the issue again before the merits panel.

---

\* Retired Senior Judge assigned to the Superior Court.

The facts as found by the orphans' court are as follows. Marian, and her deceased husband, Alfred Toth (Alfred), had four sons: Appellant, Christopher Toth (Christopher), Geoffrey Toth (Geoffrey) and Richard Toth (Richard). Orphans' Court Opinion (OCO), 7/13/18, Finding of Fact (F.F.) ¶1. Appellant was estranged from the family for many years as a result of conflicts with Alfred's commanding presence as the head of the family. *Id.*, F.F. ¶2. In 1994, Richard was living in Hungary and married Gabriella, who was a Hungarian citizen. *Id.*, F.F. ¶3. Richard and Gabriella moved to the United States in 1997 following the birth of the first of their two sons, and, from that point forward, the couple lived in close proximity to Marian and Alfred and were very involved in their lives. *Id.*, F.F. ¶¶4, 5.

In or around 1969, Alfred purchased the Property, which is located at 409 Lancaster Avenue, Haverford, Pennsylvania, along with an adjoining property at 411 Lancaster Avenue; each of the properties contained a small apartment building. *Id.*, F.F. ¶3. In 2009, Alfred and Marian began divesting themselves of the real property that they owned by giving properties to family members, beginning in that year with the transfer of the 411 Lancaster Avenue property to Richard and the transfer of a residence in Rosemont, Pennsylvania to Richard and Gabriella for use as their family home. *Id.*, F.F. ¶6. The following year, Alfred transferred the Property to Christopher. *Id.*

In March 2013, Christopher died intestate. *Id.*, F.F. ¶7. Alfred served as the personal representative for Christopher's estate, and, as the sole heirs of Christopher's estate, Alfred and Marian became joint equitable owners of

the Property. *Id.* Shortly after Christopher's death, Alfred, Richard and Gabriella inspected the Property and discovered that the building was in poor condition with only two of the five apartments habitable. *Id.*, F.F. ¶9. Alfred asked Richard and Gabriella to oversee renovations to the Property to facilitate its sale. *Id.*

After unsuccessfully listing the Property for sale, Alfred obtained an appraisal in August 2013 indicating that the market value of the Property was $900,000 and that the building would require extensive repairs. *Id.*, F.F. ¶11. Rather than listing the Property again for sale and in light of the fact that Marian and Alfred lacked the funds to pay for renovations, Alfred decided to transfer the Property to Gabriella. *Id.*, F.F. ¶12. Part of Alfred's reasoning for transferring the Property to Gabriella alone and not also to Richard was that, although both Gabriella and Richard had already performed significant uncompensated work on the Property, Richard already had his hands full with the 411 Lancaster Avenue property. *Id.* Alfred approached Gabriella in November 2013 to propose conditionally transferring the Property to her; Gabriella initially expressed hesitation to agree to assume responsibility for the Property due to her obligations related to her children, work and post-graduate studies, but she agreed to Alfred's request several months later. *Id.*, F.F. ¶¶13-14.

In March 2014, Alfred asked Dolores Troiani, his long-time attorney, to draft a memorandum of understanding (MOU) regarding the transfer. *Id.*, F.F. ¶14. The MOU provided that Alfred and Marian wished to transfer title of

the Property to Gabriella in exchange for consideration of $1.00 and in recognition of Gabriella's uncompensated efforts in maintaining the Property and assisting Alfred and Marian. MOU, Recitals, ¶1. The MOU further provided that Gabriella would: manage the Property; receive reasonable compensation for her management work; distribute the net profits from the Property in equal shares to herself, her two sons, her brother-in-law Geoffrey, and the Alfred L. Toth Alaptivany Foundation (Foundation); and distribute net proceeds from the sale of the Property among the same five parties. *Id.*, ¶¶3-5.

Though not intended by Troiani to be a final draft, Alfred presented Gabriella with the MOU on March 31, 2014, and Gabriella assented to the terms of the agreement. OCO, F.F. ¶16. Gabriella, Marian and Alfred then executed the MOU on that date. **Id.** In February 2015, Alfred informed Troiani that he wished to transition the management and accounting of the Property from Troiani's firm to Gabriella pursuant to the MOU. **Id.**, F.F. ¶18. Troiani, who had not been aware that her initial draft MOU had been executed in March 2014, advised Marian, Alfred and Gabriella to execute an addendum to the MOU that would pay Marian and Alfred the net profits generated by the Property during their lifetimes. **Id.**, F.F. ¶¶18-19. These payments would compensate Marian and Alfred for a $94,000 loan that they had taken out to pay taxes and costs related to Christopher's estate to allow the Property to be transferred out of the estate. **Id.**, F.F. ¶19. On March 4, 2015, Marian, Alfred and Gabriella executed the addendum to the MOU, which also affirmed the terms of the original agreement, in the presence of Troiani and a notary. **Id.**,

F.F. ¶20. In accordance with this understanding, Gabriella personally undertook extensive physical labor renovating the Property and spent thousands of unreimbursed dollars on the Property. *Id.*, F.F. ¶21.

Alfred died on January 24, 2016. *Id.*, F.F. ¶24. On February 2, 2016, Richard and Gabriella filed a Petition for Adjudication of Incapacity and Appointment of Plenary Guardian of the Estate and Person of Marian D. Toth (Guardianship Petition) in the orphans' court. In a deposition attached to the Guardianship Petition, Marian's primary care physician, Daniel Wolk, M.D., opined that Marian suffered from severe impairment in cognition and short-term memory, that her ability to manage her financial resources was totally impaired and that she required 24-hour care at home or in an elder care facility. Guardianship Petition, 2/2/2016, Ex. A. Richard and Gabriella sought to be appointed co-guardians of Marian's estate and person, and Geoffrey, who at that time resided with Marian at her Devon home and was unable to serve as guardian to his mother due to his own disability, consented to Richard and Gabriella's appointment. *Id.* ¶¶24-28.

On March 8, 2016, Gabriella and Troiani filed a revised Guardianship Petition substituting Troiani for Richard as guardian and a petition requesting that Gabriella and Troiani be appointed as temporary co-guardians for Marian's estate and person based on an impending need to access funds to pay for Marian's personal care. That same day, the orphans' court entered an order determining that Marian was incapacitated and appointing Gabriella and

Troiani as temporary co-guardians of Marian with authority to pay for Marian's care and to make medical decisions for her.

On May 25, 2016, Troiani, as temporary guardian of Marian, filed the emergency petition, which sought, *inter alia*, approval from the orphans' court to transfer ownership of the Property to Gabriella pursuant to the March 2014 MOU and the March 2015 addendum to the MOU. Emergency Petition ¶9. Appellant filed an answer to the emergency petition on June 1, 2016; in his answer, Appellant opposed the proposed transfer and requested an evidentiary hearing concerning whether there was undue influence over Marian's decision to transfer the Property. Answer to Emergency Petition ¶9.a. Separately, Appellant challenged Gabriella and Troiani's appointment as temporary co-guardians of Marian and sought to have an independent guardian appointed in their place. Following hearings, the orphans' court entered an order on October 18, 2016 on the agreement of the parties appointing Guardian Services of Pennsylvania as plenary guardian of the person and estate of Marian. The order did not resolve the proposed transfer of the Property, instead directing the parties to proceed to mediation on the issue. Order, 10/18/16, at 3.

Mediation was unsuccessful, and hearings were held on April 3 and 4, 2018 regarding Appellant's claim of undue influence by Gabriella over Marian. At the conclusion of the April 4, 2018 hearing, Appellant had only one remaining witness to call, a medical expert who would testify solely as to whether Marian had a "weakened intellect," one of the three elements of

undue influence claim.[3]  Instead of allowing this witness to testify, the orphans' court directed the parties to submit briefs on whether Appellant had proven the other two elements of undue influence that Marian and Gabriella were in a "confidential relationship" whereby Gabriella could exert influence over Marian and that Gabriella would accrue a "substantial benefit" from the transfer.  In addition, the orphans' court directed the parties to address in their briefs the issue of whether Appellant had standing to challenge the proposal by Marian's guardian to transfer the Property to Gabriella pursuant to the terms of the MOU.

On May 8, 2018, the orphans' court entered an order granting the emergency petition as to the proposed transfer of the Property.  In the order, the orphans' court concluded that Appellant was not aggrieved by the transfer of the Property and therefore lacked standing to contest the emergency petition because Appellant was not a party to the MOU, was not intended as a third-party beneficiary to the MOU and had no interest, ownership or otherwise, in the Property.  Order, 5/8/18, at 2; **see also** OCO at 17-19.  Furthermore, the orphans' court concluded that Appellant's claim of undue influence failed because, even assuming that Appellant had shown that Marian had a "weakened intellect," no credible evidence was submitted supporting

_____

[3] As explained in greater detail below, a "weakened intellect," a "confidential relationship," and a "substantial benefit" are the elements of an undue influence claim.  **See, e.g.**, **In re Estate of Smaling**, 80 A.3d 485, 493 (Pa. Super. 2013) (*en banc*) (stating elements of an undue influence claim).

the existence of a "confidential relationship" between Marian and Gabriella. Order, 5/8/18, at 2-3; *see also* OCO at 14-15. On May 16, 2018, Appellant filed a timely notice of appeal.[4]

> On appeal, Appellant raises four issues for our review:
>
> [1]. In the case at Bar, did a son and heir at law have standing to contest a petition to deplete the estate of his incapacitated mother[?]
>
> [2]. On or about March, 2014, did Alfred and Marian Toth intend the [MOU] not as a gift or a transfer of title, but as the early draft of an agreement, for Gabriella Toth to collect rent at the Property and to pay retirement income to them?
>
> [3]. Where the Hon. Katherine B. L. Platt found Marian Toth incapacitated, Dr. Daniel Wolk, M.D. found her ability to manage financial resources impaired "Totally –due to dementia," Dr. Thorne Sparkman[,] M.D. observed, "she does not know when and where she is," and the court cancelled testimony by Dr. Dale Panzer, M.D., does the Record provide evidentiary support for the Order stating: "no credible evidence was offered that Marian Toth and Gabriella did not deal on equal terms"?
>
> [4]. By overlooking self-dealing fiduciaries, and their misstatements, did the court below rely on rules of law palpably wrong or clearly inapplicable?

Appellant's Brief at 3 (re-ordered to facilitate disposition; suggested answers omitted).

Prior to reaching the substantive appellate questions raised by Appellant, we must first address the threshold issues of whether Appellant's appeal is moot due to events subsequent to the issuance of the order under appeal and whether Appellant had standing to contest the emergency petition

---

[4] Appellant filed his concise statement of errors of appeal on June 7, 2018, and the orphans' court issued an opinion on July 13, 2018.

requesting approval for Marian's guardian to transfer of the Property from Marian to Gabriella. Regarding the claim of mootness, Appellee alleges that, on May 18, 2018, two days after Appellant filed his notice of appeal, Marian's guardian signed a deed transferring the Property to a limited liability company (LLC) formed by Gabriella. Motion to Dismiss ¶11. Appellee further alleges that, because Appellant never sought a stay of the orphans' court's May 8, 2018 order or posted the appropriate security pursuant to Pa.R.A.P. 1733(a), the deed was recorded and delivered on August 1, 2018. *Id.*, ¶¶12-13. A copy of the purported deed is attached to the motion to dismiss. *Id.*, Exhibit A. Appellee argues that, as the transfer of the Property has already occurred, Appellant's appeal to prevent the transfer is rendered moot.

This Court has previously explained the mootness standard when addressing a motion to dismiss filed during the pendency of an appeal as follows:

> Generally, an actual claim or controversy must be present at all stages of the judicial process for the case to be actionable or reviewable…. If events occur to eliminate the claim or controversy at any stage in the process, the case becomes moot. An issue can become moot during the pendency of an appeal due to an intervening change in the facts of the case or due to an intervening change in the applicable law. An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.

*Deutsche Bank National Co. v. Butler*, 868 A.2d 574, 577 (Pa. Super. 2005) (citations and quotation marks omitted).

Here, Appellee has not established with certainty this appeal is moot, and, therefore, we deny Appellee's motion to dismiss. While Appellee attaches

a copy of what is alleged to be a validly recorded and delivered deed transferring the Property to an LLC controlled by Gabriella, Appellant, in his response to the motion, denied knowledge sufficient to admit or deny the truth of the allegations that the deed was a legally operative grant of title in the Property to Gabriella. Answer to Motion to Dismiss ¶¶11-12. Therefore, it is not clear on the record before us that the Property has in fact been transferred to Gabriella as Appellee asserts. *See Sturgis v. Doe*, 963 A.2d 1291 (Pa. 2009) (*per curiam*) (reversing Commonwealth Court's dismissal of action for mootness because "the record does not with certainty establish that the matter is moot"). Furthermore, Appellee has not shown that a third-party bona fide purchaser has acquired an interest in the Property such that the transfer of the Property from Marian to Gabriella could not be set aside by the orphans' court.

Next, we address Appellant's first appellate issue in which he contends that the orphans' court erred in concluding that he lacked standing to challenge the proposed transfer of the Property to Gabriella in the emergency petition. Appellant argues that he had standing to object to the transfer of the Property to Gabriella because he is an heir at law with a right to Marian's intestate estate under the Probate, Estates and Fiduciaries Code (PEF Code). Appellant also notes that his two sons were named in Marian's will and he therefore argues that he had standing to protect their interests in her estate.

> Our Supreme Court has explained the concept of standing as follows
> In Pennsylvania, the doctrine of standing…is a prudential,
> judicially created principle designed to winnow out litigants who

have no direct interest in a judicial matter. For standing to exist, the underlying controversy must be real and concrete, such that the party initiating the legal action has, in fact, been aggrieved. … A party is aggrieved for purposes of establishing standing when the party has a substantial, direct and immediate interest in the outcome of litigation. A party's interest is substantial when it surpasses the interest of all citizens in procuring obedience to the law; it is direct when the asserted violation shares a causal connection with the alleged harm; finally, a party's interest is immediate when the causal connection with the alleged harm is neither remote nor speculative.

*Office of Governor v. Donahue*, 98 A.3d 1223, 1229 (Pa. 2014) (citations and quotation marks omitted).

We concur with the determination of the orphans' court that Appellant lacked standing. Put simply, Appellant was not aggrieved because he did not have a substantial, direct or immediate interest in either the enforcement of the terms of the MOU or its addendum or the transfer of the Property from Marian to Gabriella. As regards the MOU, Appellant was not a party to the agreement, which was entered into by Alfred, Marian and Gabriella. The performance of a contract may also be challenged by a third-party beneficiary to the agreement of others; however, the third-party beneficiary does not have standing unless recognition of the beneficiary's right is appropriate to effectuate the intention of the parties to the agreement. *Estate of Agnew v. Ross*, 152 A.3d 247, 252-53 (Pa. 2017) (citing *Guy v. Liederbach*, 459 A.2d 744 (Pa. 1983), which adopted the Restatement (Second) of Contracts § 302 pertaining to intended and incidental beneficiaries); *Estate of Young v. Louis*, ___ A.3d ___, 2018 PA Super 358, *7 (filed December 31, 2018); *Weber v. Weber*, 168 A.3d 266, 270-71 (Pa. Super. 2017). The MOU

- 11 -

identified Appellant's brother, Geoffrey, Gabriella, Gabriella and Richard's two children, and the Foundation as recipients of the net proceeds from any future sale of the Property; however, Appellant was not identified by name in the agreement. Furthermore, there is no indication that Appellant's parents or his sister-in-law intended for Appellant to have any interest whatsoever with respect to the terms of the MOU or the management of the Property.

Appellant also may not claim to have standing in this proceeding as a result of the PEF Code. The General Assembly may, by statute, confer standing on particular individuals or entities in particular circumstances. *See Commonwealth v. Janssen Pharmaceutica, Inc.*, 8 A.3d 267, 274 (Pa. 2010). It is clear that Appellant, as a potential heir to Marian's intestate estate, had standing under the PEF Code to appear in the prior orphans' court proceedings to determine whether Marian was incapacitated and required a guardian. 20 Pa.C.S. § 5511(a); *In the Matter of Brown*, 507 A.2d 418, 419 (Pa. Super. 1986) ("Pursuant to 20 Pa.C.S. § 5511(a), only those persons who are sui juris and would be entitled to share in the alleged incompetent's estate are required to be notified of impending incompetency proceedings."). Nevertheless, simply because Appellant had standing at the initial proceeding concerning the appointment of a guardian does not mean his standing extended to all later proceedings involving his mother's property, particularly in a case such as this where Marian's guardian sought to enforce a contract entered into prior to her incapacity that called for the transfer of a property

as to which Appellant had no involvement. Appellant has cited to no provision of the PEF Code that would authorize his standing here.[5]

Appellant argues that he has standing to challenge the enforcement of the MOU to represent his two minor sons as potential heirs to Marian and out of a concern that the transfer of the Property would deplete her estate. Testimony at the hearings below demonstrates that, while Appellant is not named in Marian's will, his two sons are named in her will as beneficiaries. N.T., 4/4/18, Vol. I, at 12-13. Appellant, however, did not file the answer to the emergency petition on behalf of his sons nor did he at the orphans' court hearings raise the interests of his sons' potential inheritance as his animating concern in objecting to the proposed transfer. As Appellant has not raised this issue prior to his appeal, his claim of standing based on the interests of his sons' potential inheritance is waived. **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); **Andrews v. Cross Atlantic Capital Partners, Inc.**, 158 A.3d 123, 129-30 n.10 (Pa. Super. 2017) (*en banc*) (new legal theory may not be raised for the first time on appeal and claim based on new theory is waived).

_____

[5] The PEF Code does provide that the orphans' court may hold a review hearing at any time on a petition filed by "any interested party" who challenges whether the guardian is complying with the law or acting in the best interests of the incapacitated person. 20 Pa.C.S. § 5512.2(a). However, in the proceedings below, Appellant did not raise the issue of whether Marian's guardian was complying with the law or whether the proposed transfer was in Marian's best interest. **See infra** note 7.

Even if Appellant had standing to contest the proposed transfer of the Property to Gabriella, Appellant has not identified any reversible error by the orphans' court in his remaining three appellate issues. When reviewing an order entered by the orphans' court, the "decision will not be reversed unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law." *In re Estate of Krasinski*, 188 A.3d 461, 466 (Pa. Super.) (*en banc*) (citation omitted), *appeal granted on other grounds*, 198 A.3d 1045 (Pa. 2018). Our standard of review of the findings of fact of the orphans' court is deferential. *In re Fiedler*, 132 A.3d 1010, 1018 (Pa. Super. 2016) (*en banc*).

> [T]his Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the [o]rphans' [c]ourt sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion.

*Id.*

The substantive issue before the orphans' court was whether Gabriella unduly influenced Marian to enter into the MOU and its addendum that contractually required the transfer of the Property to Gabriella. "[T]he exercise of undue influence, at its core, indicates that an individual so influenced has lost the ability to make an independent decision." *Yenchi v. Ameriprise Financial, Inc.*, 161 A.3d 811, 822 (Pa. 2017). The issue of undue influence regularly arises in will contest cases, and the orphans' court

applied the undue influence standard enunciated in those cases.[6] Under that standard, the contestant must establish "by clear and convincing evidence" that: "(1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question." *In re Estate of Smaling*, 80 A.3d 485, 493 (Pa. Super. 2013) (*en banc*); *see also Estate of Luongo*, 823 A.2d 942, 963 (Pa. Super. 2003). Once the contestant establishes these three elements, "a presumption of undue influence arises and the burden of proof shifts back to the proponent to prove affirmatively the absence of undue influence." *In re Estate of Pedrick*, 482 A.2d 215, 219 (Pa. 1984); *see also Smaling*, 80 A.3d at 493.

In his second appellate issue, Appellant presents various arguments concerning the validity of the MOU and its addendum, arguing that the terms of the agreements were ambiguous, that the agreements were

_____

[6] In decisions concerning the issue of whether a party was influenced into entering into a contract or commercial transaction outside of the will contest context, the courts have generally not applied the three-part standard employed in such cases and instead have focused only on the issue of whether a confidential relationship existed. *See, e.g.*, *Yenchi*, 161 A.3d at 820-22; *Frowen v. Blank*, 425 A.2d 412, 416-17 (Pa. 1981); *see also Biddle v. Johnsonbaugh*, 664 A.2d 159, 162 n.1 (Pa. Super. 1995) ("While the two terms [confidential relationship and undue influence] are sometimes used interchangeably, the latter is used mostly in will contests, and the former is employed most often in contract disputes."). As Appellees have not objected to the orphans' court's application of the three-part undue influence test used in will contest cases and as the question of whether there was a confidential relationship between Gabriella and Marian is the dispositive issue in this matter, we are not called upon to address whether the orphans' court applied the correct legal standard.

unconscionable, that there was no meeting of the minds between the parties to the agreements and that several conditions precedent had not occurred that were necessary before the orphans' court could transfer title of the Property.

None of these arguments were raised either at the hearing or at any time prior to the filing of his Rule 1925(b) concise statement of matters complained of on appeal. "An issue raised for the first time in a concise statement is waived." **Beemac Trucking, LLC v. CNG Concepts, LLC**, 134 A.3d 1055, 1058 (Pa. Super. 2016); **Irwin Union National Bank and Trust Co. v. Famous**, 4 A.3d 1099, 1104 (Pa. Super. 2010); **see also** Pa.R.A.P. 302(a). In his answer to the May 25, 2016 emergency petition, Appellant solely raised the issue of undue influence as the basis for his object to the proposed transfer, stating that "[a]n evidentiary hearing is needed on whether there was undue influence over incapacitated persons." Answer to Emergency Petition ¶9.a. Similarly, when questioned by the court at the hearings, counsel for Appellant made clear that the only issue that he was proceeding on was whether there was undue influence by Gabriella over Marian. N.T., 2/26/18, at 9-10; N.T., 4/3/18, Vol. II, at 178-81. Appellant also failed to raise any contractual arguments in his post-hearing brief. As the sole issue before the

orphans' court was undue influence, Appellant's first appellate issue is barred by waiver.[7]

In the third issue, Appellant argues that the orphans' court capriciously disregarded clear evidence of Marian's mental incapacity at the time she and her husband executed the MOU and its addendum.

Initially, to the extent that Appellant argues that Marian lacked capacity to enter into the MOU and the addendum to the MOU, this issue was not raised below and is accordingly waived. While there is substantial overlap with the weakened intellect element of an undue influence claim, capacity to contract is a separate and distinct legal issue from weakened intellect and is treated as one of the fundamental prerequisites for the formation of a contract. ***See, e.g.***, ***Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control***

---

[7] Appellant also argued in his first issue that the MOU did not evidence a clear donative intent required for a valid *inter vivos* gift, that the Guardian's decision to enforce the MOU was not in Marian's best interest, and that Troiani's testimony regarding the formation of the MOU was incompetent because she was conflicted and stood to gain fees from Gabriella's management of the Property. Appellant did not raise the issue of whether Marian's guardian was acting in her best interests or whether the Property was transferred pursuant to Gabriella as a valid *inter vivos* gift prior to this appeal, and therefore these issues are likewise waived. Furthermore, Appellant's counsel expressly disclaimed at the hearing that he was challenging the MOU as a gift of the Property to Gabriella rather than a contract. N.T., 4/3/18, Vol. II, at 52. Moreover, at no point during the hearing did Appellant object on the basis of competency to Troiani's testimony regarding the formation of the MOU or its addendum. ***See In re S.C.B.***, 990 A.2d 762, 767 (Pa. Super. 2010) (stating that an issue will be waived for appellate review if a party fails to make a timely and specific objection at the appropriate stage of the proceedings to allow the lower court an opportunity to correct any error).

**Board**, 739 A.2d 133, 136 (Pa. 1999) ("The law of this Commonwealth makes clear that a contract is created where there is mutual assent to the terms of a contract by the parties with the capacity to contract."). Appellant did not raise capacity to contract in his answer to the emergency petition, and Appellant's counsel expressly stated at the hearing that Marian's capacity was not being challenged in this case. N.T., 4/3/18, Vol. II, at 178-81.

Furthermore, contrary to Appellant's assertion, the orphans' court did not ignore evidence regarding Marian's diminished mental state. Instead, at the conclusion of the second day of testimony and with only Appellant's medical expert left to testify, the orphans' court asked the parties to assume that Appellant had demonstrated Marian's weakened intellect and submit briefs on whether Appellant had proved the other two undue influence elements. N.T., 4/4/18, Vol. II, at 60-66. The orphans' court ruled in its May 8, 2018 order that "even assuming that [Appellant] could establish that his mother suffered from a 'weakened intellect' at the time of executing the agreement, his claim of undue influence must necessarily fail due to the lack of credible evidence supporting the existence of a confidential relationship between [Marian] and Gabriella." Order, 5/8/18, at 2-3. Thus, the lower court resolved the issue of undue influence solely on the basis of a lack of

evidence of a confidential relationship, and, therefore, the question of whether Marian had a weakened intellect is not before this Court.[8]

In the final issue before us on appeal, Appellant challenges the orphans' court's determination that Gabriella did not have a confidential relationship with Marian, arguing that the evidence he presented proved that Gabriella, with the assistance of Troiani, had an overmastering influence over Marian, which Gabriella used to convince Marian to transfer the Property to her.

"[A] confidential relationship appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." *Yenchi*, 161 A.3d at 820 (quoting *Frowen v. Blank*, 425 A.2d 412, 416-17 (Pa. 1981)) (punctuation omitted). A confidential relationship "is not confined to a particular association of parties, but exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Smaling*, 80 A.3d at 498 (quoting *Estate of Keilper*, 454 A.2d 31,

---

[8] Likewise, contrary to Appellant's contention, the orphans' court did not abuse its discretion in granting the emergency petition without allowing Appellant to present his medical expert. Appellant failed to make a contemporaneous objection to the orphans' courts' decision to postpone the hearing to call the medical expert until after the orphans' court decided whether the other two elements of undue influence had been proven following briefing by the parties, and, therefore, this issue is waived. *See S.C.B.*, 990 A.2d at 767. Moreover, Appellant's counsel represented at the hearing that the expert would solely be testifying on the weakened intellect element, N.T., 4/4/18, Vol. II, at 62, and, therefore, this testimony would not have aided Appellant in proving the other two elements of the undue influence claim.

33 (Pa. Super. 1982)); *see also Frowen*, 425 A.2d at 416. "[A] business transaction may be the basis of a confidential relationship only if one party surrenders substantial control over some portion of his affairs to the other." *Yenchi*, 161 A.3d at 823 (quoting *In re Estate of Scott*, 316 A.2d 883, 886 (Pa. 1974)). Furthermore, "even where special vulnerabilities exist, this Court has not recognized the existence of a confidential relationship if the person continued to act on his or her own behalf and did not succumb to any 'overmastering influence' of another." *Id.* at 821–22.

Pertinent to its conclusion that no confidential relationship existed, the orphans' court found that Gabriella developed a loving, familial bond with Marian and Alfred and visited them almost daily as they became elderly. OCO, F.F. ¶¶5, 22. The orphans' court found that Gabriella never discussed finance or money with Marian, never exhibited any superiority or overmastering influence over Marian and never told Marian to do anything. *Id.*, F.F. ¶22. The orphans' court further found that Alfred made the decision, with Marian's assent, to transfer title of the Property to Gabriella and that Gabriella exercised no influence over Alfred and Marian with respect to that decision, had no input in drafting the MOU or its addendum, and played no role in the decision to file the emergency petition to seek approval for the transfer of the Property. *Id.*, F.F. ¶¶12, 15, 20, 23.

Our careful review of the record reveals that there is ample evidence to support the orphans' court's findings and its conclusion that no confidential relationship existed. In particular, Gabriella testified that she was very close

- 20 -

to Alfred and Marian, called them Mom and Dad, loved them like her own parents and almost never asked for anything from them. N.T., 4/4/18, Vol. II, at 18, 55-56. Gabriella testified that Alfred and Marian adored her and treated her as the daughter they never had. *Id*. at 55-56. Gabriella stated that it was Alfred's idea to transfer the Property to her and that she was initially reluctant because of her work, children and studies, but that Alfred, whose orders she felt compelled to follow, eventually persuaded her to assume the responsibility of maintaining the Property. *Id*. at 13-15, 17-18, 21, 26-27, 56. Gabriella testified that she never discussed the Property, the MOU or any other business arrangements with Marian and that she never told Marian to do anything. *Id*. at 13, 20, 56. Troiani testified that Gabriella loved Marian and Alfred and that Marian and Alfred reciprocated the feeling towards Gabriella, viewing her as their daughter. N.T., 4/3/18, Vol. II, at 144-45, 216. According to Troiani, Gabriella had no influence over Alfred and Marian's decision to transfer the Property to her and never expressed any desire to obtain an ownership interest in the Property. *Id.* at 73, 217-18. As the orphans' court wisely observed in its decision, this case evokes our Supreme Court's timeless advice that "care must be used not to confound acts springing from natural love and affection with confidential relations." *Leedom v. Palmer*, 117 A. 410, 412 (Pa. 1922).

Accordingly, because Appellant lacked standing to challenge the enforcement of the terms of the MOU providing for the transfer of the Property from Marian to Gabriella and because, in any event, Appellant failed to meet

his burden in showing undue influence by Gabriella over Marian, the orphans'

court did not err or abuse its discretion in granting the emergency petition.

*See Krasinski*, 188 A.3d at 466.

Order affirmed. Motion to dismiss for mootness denied.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/5/19