J-S32033-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| GLENN & DONNA LEWIS (H/W) AND LEWIS AUTOMOTIVE, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| | : | No. 2115 EDA 2018 |
| ERIE INSURANCE EXCHANGE D/B/A ERIE INSURANCE GROUP, MILLER'S INSURANCE AGENCY, INC., AND ART MILLER INDIVIDUALLY AND T/A MILLER'S INSURANCE AGENCY, INC. | : | |

Appeal from the Judgment Entered June 11, 2018
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  February Term, 2014 No. 03000

BEFORE:  SHOGAN, J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED AUGUST 21, 2019**

Glenn and Donna Lewis, husband and wife, along with Lewis Automotive, Inc. (LAI) (collectively, Appellants) appeal from the judgment entered, following a jury trial, in favor of Erie Insurance Exchange D/B/A Erie Insurance Group (Erie), Miller's Insurance Agency, Inc., and Art Miller individually and T/A Miller's Insurance Agency, Inc. (collectively, Miller). Appellants present 11 claims of trial court error for our review. After careful consideration, we affirm.

At the outset, we are compelled to comment on the briefs Appellants have filed with this Court. In the original 136-page brief, Appellants' counsel,

Michael J. Gavin, Esquire,[1] certified that the "**[a]rgument** contains 13,816 words, and is in compliance with [Pa.R.A.P.] 2135." Appellants' Brief, 12/10/18, at 135 (emphasis added) (stricken by order of 1/25/19). Contrary to the premise of this "certification," Rule 2135 clearly provides that a "principal brief" — and not merely an argument section — "shall not exceed 14,000 words." **See** Pa.R.A.P. 2135(a)(1).[2] Following application by Erie and Miller, this Court issued a *per curiam* order on January 25, 2019, striking Appellants' brief and directing Appellants to file a compliant brief within 30 days.

On March 6, 2019, Erie filed an application to dismiss the appeal because Appellants failed to file an amended brief. On March 8th, Elizabeth Gavin, Esquire, entered her appearance on behalf of Appellants and filed an answer. Attorney Gavin acknowledged that a brief was past due, provided personal reasons for why she missed the deadline, and requested this Court to accept for filing an attached proposed brief. This Court accepted the brief as filed late, without prejudice to Erie to re-raise the untimeliness of Appellants' brief. Ours review reveals that Appellants' amended brief contains approximately 13,000 words.

---

[1] When this brief was filed, Brian Kent, Esquire, and Samuel Reich, Esquire, were also counsel of record for Appellant.

[2] **See also** Pa.R.A.P. 2135(b) ("Supplementary matters, such as, the cover of the brief[,] table of contents, tables of citations, proof of service and any addendum . . . shall not count against the word count limitations[.]").

Erie has again argued for dismissal of this appeal on the basis of Appellants' late-filed amended brief. Erie's Brief at 67, citing Pa.R.A.P. 2188 ("If an appellant fails to file his . . . brief . . . within the time prescribed by these rules, or within the time as extended, an appellee may move for dismissal of the matter."). Erie does not question Attorney Elizabeth Gavin's personal reasons for failing to meet this Court's deadline for filing an amended brief, but points out that she did not enter her appearance until the day she filed a response to the dismissal motion, and Appellants failed to explain why any of their three other attorneys, already of record, failed to file the brief. Erie further avers that Appellants' non-compliance with the rules and court deadlines "necessitated repetitive motion practice." Erie's Brief at 68.

While we agree that the procedural history of this appeal has been protracted by this Court's acceptance of Appellants' late-filed, amended brief, we decline to dismiss this appeal. We nonetheless observe that although the amended brief is significantly shorter than the original brief, Appellants continues to raise the same 11 issues previously presented. We caution Appellants' counsel:

> Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. . . .
>
> \* \* \*
>
> There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review. . . . A brief that

raises every colorable issue runs the risk of burying good arguments[.]

***Commonwealth v. Showers***, 782 A.2d 1010, 1015-1016 (Pa. Super. 2001)

(quoting ***Jones v. Barnes***, 463 U.S. 745, 751-753 (1983)).

We now turn to the facts, which the trial court recounted as follows:

Glenn Lewis began purchasing Erie Insurance Exchange insurance policies through [Miller] in 1986. Lewis founded [LAI] in 1989 and purchased Erie insurance for his company through Miller. Thereafter, Art Miller would meet Glenn Lewis annually to discuss Lewis's insurance needs. Before these meetings, Miller would send, and Lewis would complete, a detailed questionnaire evaluating Lewis's satisfaction with his insurance coverage. These questionnaires asked whether Glenn Lewis would like his insurance policies to remain the same or be revised.

Based on interaction with Glenn Lewis and his own professional experience as a licensed insurance broker, Art Miller would secure insurance coverage for Lewis for his approval and purchase. At their meetings, Art Miller gave Glenn Lewis three ring binders containing the . . . policies and applicable declarations sheets including exclusions. At all times, Glenn Lewis preserved his right to accept or refuse policies suggested by Art Miller. Lewis testified, however, that [Glenn Lewis] was not someone who read or studied his policy documents.

One of [LAI's] insurance policies was the Erie Pioneer Garage/Auto Policy, policy #Q092780115 ("Garage Policy"). This policy offered $1,000,000 in uninsured [(UM)] and underinsured [(UIM)] motorist coverage. [LAI also] had an Erie Business Catastrophe Liability Policy [#]Q332770056 ("Umbrella Policy"), which covered other accidents up to . . . $1,000,000. Each year after 1998, Glenn Lewis signed a renewal of [LAI's] policies.

[On February, 26,] 1998, however, Glenn Lewis elected to exclude UM [and UIM] coverage in [LAI's] Umbrella Policy. In making this choice, Lewis signed a release form which Art Miller presented at trial[, over Appellants' objection]. The release contains Glenn Lewis' signatures written and dated in three places.

Coincidentally, around the same time in 1998, Erie announced a corporate decision to forego offering UM [and UIM] coverage under the type of Garage Policy applicable to [LAI. T]his meant that beginning in 2004, [the] Garage Policy would provide general coverage in the amount of $1,000,000, but nothing more in the event an insured has an accident with an underinsured or uninsured tortfeasor.

In October 2007, Miller recommended that Lewis increase [LAI's] general coverage under the Garage Policy to $2,000,000, but Glenn Lewis declined on grounds it was too expensive.

On July 30, 2010, Glenn Lewis was injured in an automobile accident. The accident was covered under [LAI's] Garage Policy and Lewis was paid the $1,000,000 policy limit by Erie. However, [LAI's] Umbrella Policy UM [and UIM] exclusion which Glenn Lewis signed in 1998 was still in force, and Erie denied additional coverage.

Sometime in 2011, but after the July 30, 201[0] accident, Art Miller met with Glenn Lewis to review [LAI's] insurance coverage. [At trial, Lewis testified that at this September meeting,] Miller told him the accident was covered under both the Garage Policy and the Umbrella Policy. Glenn Lewis told the jury that when he heard this, he wrote on a sheet of paper the phrase "$1,000,000 Million Dollars over and above my business." Lewis testified that then crossed out the words "my business" and wrote "all my other policies." These handwritten notes were introduced at trial. Glenn Lewis testified he relied on Art Miller's representations and was therefore surprised when Erie denied UM Umbrella Coverage in the amount of $1,000,000.

Trial Court Opinion, 8/24/18, at 2-4 (footnotes and citations to record omitted).

At this juncture, we note the extensive procedural history of this case. The certified electronic record exceeds 9,900 pages, and the trial docket contains 177 separate entries. While we do not recite the entire procedural history, we note the following. Appellants commenced this action on February

27, 2014. In their second amended 10-count complaint, Appellants alleged bad faith against Erie; breach of fiduciary duty against Miller; and each of the following against both Erie and Miller: breach of contract, negligence, fraudulent misrepresentation, and violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law[3] (UTPCPL).

Miller and Erie filed preliminary objections, after which the trial court dismissed: (1) the breach of contract and UTPCPL violations claims against Miller with prejudice; (2) the claims of negligence and fraudulent misrepresentation against Miller with leave for Appellants to file an amended complaint; and (3) the claims of breach of contract, bad faith, and UTPCPL violations against Erie with prejudice. Order, 11/14/14 (sustaining Miller's preliminary objections); Order 11/14/14 (sustaining in part Erie's preliminary objections).

On December 4, 2014, Appellants filed a third amended complaint, presenting 5 counts: 2 counts each of negligence and fraudulent misrepresentation against Erie and Miller, and a claim of breach of fiduciary duty against Miller. On June 23, 2016, the trial court dismissed both claims of fraudulent misrepresentation on summary judgment. Order, 6/23/16 (granting in part and denying in part Miller's and Erie's summary judgment motions).

---

[3] 73 P.S. §§ 201-1 to 201-9.3.

The case proceeded to a jury trial on October 18, 2017. Pertinent to this appeal, the trial court precluded Appellants' insurance expert, Thomas McKiernan, from testifying. The trial court also permitted Miller, over Appellants' objection, to introduce the February 28, 1996 UM and UIM-rejection form executed by Glenn Lewis.

Following Appellants' presentation of evidence, the trial court entered nonsuit on the breach of fiduciary claim against Miller and the one remaining claim — negligence — against Erie. Accordingly, the only issues for the jury were the negligence of Miller, and Miller's defense of contributory negligence.

On October 30, 2017, the jury found Miller negligent, but also found that Glenn Lewis was contributorily negligent. This latter finding barred Appellants' recovery of damages.[4] Appellants filed a timely post-trial motion, which the court denied on June 8, 2018. Judgment in favor of Miller and Erie was entered on June 11, 2018, and Appellants filed a timely notice of appeal. The trial court did not direct Appellants to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal, but issued an opinion on August 24, 2018, which addressed only three of the issues presented on appeal.

On appeal, Appellants present 11 issues:[5]

---

[4] *See Boyle v. Indep. Lift Truck, Inc.*, 6 A.3d 492 n.1 (Pa. 2010).

[5] We have reordered Appellants' issues and note that in their argument, Appellants address their eighth and ninth issues together under one heading. *See* Appellants' Brief at 70-78.

1. Was it error to dismiss Appellants' breach of fiduciary duty claims against . . . Miller . . ., and failing to instruct the jury in accordance with **Yenchi**,[6] where Appellants' evidence supported a prima facie case?

2. Did the trial court err by not declaring a mistrial when counsel for . . . Miller told the jury that Appellants could not find an expert to support their claims, knowing that Appellants' expert had been precluded?

3. Was it error to dismiss counts from Appellants' Complaint prior to conducting discovery?

4. Was it error to dismiss Appellants' fraudulent misrepresentation claims against . . . Miller . . . where Appellants' evidence supported a prima facie case?

5. Was it error to admit the 1998 UM/UIM sign down form into evidence where it is precluded by law?

6. Was it error to preclude Appellants' insurance expert, Mr. McKiernan, where [Miller and Erie] conceded his qualifications?

7. Was it error to cap Appellants' damages absent any basis for doing so?

8. Was it error to exclude Appellants' Current Policies where Appellees averred such coverage did not exist and where they serve to impeach . . . Miller?

9. Was it error to exclude . . . Miller['s] website as proof of their duties and standards of care?

10. Was it error to instruct the jury on contributory negligence where Appellants suffered personal injuries?

11. Did the trial court violate the collateral source rule by advising the jury that Appellants received $1million from another insurance policy?

---

6 **Yenchi v. Ameriprise Fin., Inc.**, 161 A.3d 811 (Pa. 2017).

Appellants' Brief at 10-12.

In the first issue, Appellants challenge the nonsuit entered on their breach of fiduciary duty claims against Miller. Appellants maintain that Miller owed a fiduciary duty to them "due to the special relationship cultivated with Glenn Lewis and his father before him," and that "Lewis, a high-school educated auto mechanic, was the second generation to entrust Mr. Miller" with his insurance needs. Appellants' Brief at 62. Appellants cite the "clear testimony [by Miller that he] bound each year's coverage [90] days prior to the annual meetings with . . . Lewis, [which] conclusively demonstrate that [Miller was] making policy choices for the Lewises[.]" *Id.* at 61. Appellants claim that Miller breached his fiduciary "duty by failing to provide . . . the coverage Mr. Lewis needed for himself, his family and his business"; failed to provide "complete and truthful information to Mr. Lewis"; and failed to "cure any prior misrepresentations or omissions." *Id.* at 62.

We begin by recognizing:

Nonsuit is properly entered where it is clear that the plaintiff has not established a cause of action or right to relief. Pa.R.C.P. 230.1. In determining whether the plaintiff has established a right to relief,

[t]he plaintiff must be allowed the benefit of all favorable evidence and reasonable inferences arising therefrom, and any conflicts in the evidence must be resolved in favor of the plaintiff. [W]here it is clear a cause of action has not been established, a compulsory nonsuit is proper. We must, therefore, review the evidence to determine whether the order entering judgment of compulsory nonsuit was proper.

"This Court will reverse an order denying a motion to remove a nonsuit only if the court abused its discretion or made an error of law."

*Staiger v. Holohan*, 100 A.3d 622, 624 (Pa. Super. 2014) (citations omitted).

Our Supreme Court, in the *Yenchi* case cited by Appellants, explained:

A fiduciary duty is the highest duty implied by law. A fiduciary duty requires a party to act with the utmost good faith in furthering and advancing the other person's interests, including a duty to disclose all relevant information. This highest duty will be imposed only where the attendant conditions make it certain that a fiduciary relationship exists.

\* \* \*

Where no fiduciary duty exists as a matter of law, Pennsylvania courts have nevertheless long recognized the existence of confidential relationships in circumstances where equity compels that we do so. Our courts have found fiduciary duties in circumstances where the relative position of the parties is such that the one has the power and means to take advantage of, or exercise undue influence over, the other. The circumstances in which confidential relationships have been recognized are fact specific and cannot be reduced to a particular set of facts or circumstances.

*Yenchi*, 161 A.3d at 819-820 (citations omitted). "While cases involving fiduciary relationships are necessarily fact specific, they usually involve some special vulnerability in one person that creates a unique opportunity for another person to take advantage to their benefit." *Id.* at 821.

In the context of insurance policies, this Court has stated:

"Typically, the purchase of insurance is considered an arm's-length transaction, in which the insurer incurs no fiduciary duty apart from those that may be defined in the contract for insurance." Similarly, an agent typically does not incur a fiduciary

- 10 -

duty by selling a policy to an insured. In order for a fiduciary duty to exist, the insurer and/or the agent must have a confidential relationship with the insured.

For most insurance-based interactions, the relationship is one-sided and cannot be regarded as confidential. The general test for determining the existence of a confidential relationship is "whether it is clear that the parties did not deal on equal terms." A confidential relationship can be established by showing "over-mastering influence, . . . weakness, dependence[,] or trust, justifiably reposed."

*Dixon v. Northwestern Mut.*, 146 A.3d 780, 787 (Pa. Super. 2016) (citations and footnote omitted).

Appellants do not dispute the trial court's finding that "there was no evidence that Lewis ever ceded decision making control to Miller to buy insurance," and that "[a]t all times, Glenn Lewis preserved his right to accept or refuse policies suggested by Art Miller." *See* Trial Court Opinion, 8/24/18, at 3, 11. Also, while Appellants point to Lewis's "high school education" and the decades-long relationship between Lewis and Miller, these facts do not establish — and Appellants do not claim — a special vulnerability or weakness in Lewis, or any "over-mastering influence" on the part of Miller. *See Yenchi*, 161 A.2d at 819-21; *Dixon*, 146 A.3d at 787. Thus, we discern no error by the trial court in dismissing the breach of fiduciary duty claim against Miller.

In the second issue, Appellants claim that Miller's attorney, Michael Turner, Esquire, knowingly made false statements in closing argument. Appellants assert that Attorney Turner argued Appellants were unable to find an insurance expert who would agree or opine that Miller and Erie were

- 11 -

negligent or breached a fiduciary duty.[7]   Appellants' Brief at 39, *citing* N.T. Trial Vol. 5, 10/27/17, 106-107.   Appellants maintain that Attorney Turner knew Appellants were precluded from presenting an insurance expert, and contend Attorney Turner further told "the jury that Attorney Gavin was lying about meeting with Mr. Lewis and Mr. Miller, saying there were no notes or emails confirming the meeting when, in fact, Attorney Turner knew that they existed."[8]   *Id.* at 41.   For these reasons, Appellants request a new trial.

To the extent Appellants requests a new trial on the claim of fiduciary duty against Miller, we incorporate the above discussion disposing of Appellants' first issue.   With regard to Appellants' request for a new trial on Miller's alleged negligence, Appellants disregard the jury's verdict in their favor, *i.e.*, the jury found Miller negligent.   Accordingly, any alleged prejudice arising from opposing counsel's remarks during closing argument is moot, and no relief is due.

In the third issue, entitled "Pre-discovery dismissal of claims," Appellants challenge the trial court's dismissal of the claims of breach of contract against both Erie and Miller; "Erie's underlying bad faith"; "Erie's bad faith during litigation"; and claims of UTPCPL violations against both Erie and

---

[7] We reiterate that the claim of breach of fiduciary duty against Miller was dismissed at trial following Appellants' presentation of evidence.

[8] Appellants objected to counsel's remarks at trial.   N.T. Trial Vol. 5, 10/27/17, at 112-113.

Miller. Appellants' Brief at 42-52.

We note the relevant standard of review:

In matters requiring the dismissal of [claims] based on preliminary objections in the nature of a demurrer, this Court's scope of review is plenary. . . . A preliminary objection in the nature of a demurrer tests the legal sufficiency of the complaint. . . .

When reviewing an order granting preliminary objections in the nature of a demurrer, an appellate court applies the same standard employed by the trial court: all material facts set forth in the complaint as well as all inferences reasonably deducible therefrom are admitted as true for the purposes of review. The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. Where any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the demurrer.

*Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 714 (Pa. Super. 2005) (citations omitted).

With respect to the alleged breaches of contract, Appellants contend that they established the existence of a contract for an Umbrella Policy that provided $1 million in UIM coverage. Appellants' Brief at 43-44. In support, Appellants aver that "Erie and/or Miller told Mr. Lewis since 1989 that the Umbrella Policy provided $1 million in coverage over and above 'all the policies.'" *Id.* at 43. Appellants reason that "Erie's provision of a different policy is immaterial" because Lewis and Erie "specifically negotiate[d] for a particular type of coverage" and Erie may not avoid that coverage by later "sending . . . a policy which does not contain the bargained-for provisions." *Id.*, quoting *Matcon Diamond v. Penn Nat'l Ins. Co.*, 815 A.2d 1109, 1115

(Pa. Super. 2003).

"A breach of contract action involves (1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages." *Sullivan*, 873 A.2d at 716. Appellants do not allege that Miller was a party to either the Garage Policy or Umbrella Policy. *See id.* Thus, the trial court properly dismissed the breach of contract claim against Miller.

With respect to Erie, Appellants do not deny that in February of 1998, Glenn Lewis waived in writing UM and UIM coverage in the Umbrella Policy; that beginning in 2004 — six years before Lewis' accident — Erie no longer offered UM and UIM coverage in the Garage Policy; and that Lewis was provided with written documentation of these policies annually. Accordingly, we reject Appellants' insistence that Lewis and Miller or Erie "negotiated" the 2010 policies to include UM and UIM coverage, and conclude the trial court did not err in dismissing Appellants' claim that Erie breached a contract by denying UM and UIM benefits.

Next, as to Appellants' "underlying bad faith" claim against Erie, Appellants assert that Erie acted in bad faith by "requir[ing] additional proof of Mr. Lewis' inability to physically labor as a master mechanic, despite possessing surgical reports and knowing Mr. Lewis was in an in-patient rehabilitation facility." Appellants' Brief at 45. Appellants reason that Erie's conduct "unreasonably delayed Appellants' first party benefits." *Id.* at 44. Incorporating our discussion above, we reject the premise of this argument —

that Appellants were entitled to UM and UIM benefits, but Erie acted in bad faith by denying benefits. Accordingly, there is no basis to disturb the trial court's dismissal of the bad faith count against Erie.

Next, Appellants challenge "Erie's bad faith during litigation." Appellants' Brief at 46, *citing* **Hollock v. Erie Ins. Exch.**, 842 A.2d 409, 415 (Pa. Super. 2004) ("'[A]n action for bad faith may also extend to the insurer's investigative practices,' . . . and . . . 'the conduct of an insurer during the pendency of litigation may be considered as evidence of bad faith under [42 Pa.C.S.A. §] 8371 [(actions on insurance policies)].'"). Appellants assert: (1) Erie "attempt[ed] to scare Appellants out of their claims through, *inter alia*, its October 2015 Motion for Summary Judgment"; (2) "[d]espite the lack of any evidence . . . Erie averred throughout the litigation that [Attorney Gavin] violated his ethical obligations"; (3) "Erie took its dilatory practices further by threatening Appellant[ ] and counsel with a Dragonetti action"[9]; and (4) Erie's "[c]ounsel has publicly slandered Attorney Gavin's reputation." Appellants' Brief at 47-49. Appellants request "a new trial on Erie's bad faith litigation practices." **Id.** at 49.

The trial court did not address this issue in its opinion. Nevertheless, we reiterate that the trial court dismissed **all** of Appellants' claims against Erie prior to the close of trial. In dismissing the breach of contract, bad faith, and

---

[9] **See** 42 Pa.C.S.A. § 8351 (Wrongful use of civil proceedings).

- 15 -

UTPCPL claims on preliminary objections **prior** to trial, the court concluded that even accepting as true all material facts set forth in the complaint, Appellants failed to establish that relief was due. **See Sullivan**, 873 A.2d at 714. With respect to the trial court's dismissal of the fraudulent misrepresentation claim on summary judgment, the court determined that in viewing the record in the light most favorable to Appellants, it was clear and free from doubt that there was no genuine issue of material fact and that Erie was entitled to judgment as a matter of law. **See Toy v. Metro. Life Ins. Co.**, 863 A.2d 1, 6 (Pa. Super. 2004). To this end, while Appellants characterize Erie's filing of their summary judgment motion as bad faith conduct, Appellants disregard the trial court ruling finding merit to the motion and partially granting it. **See** Order, 6/23/16 (granting in part and denying in part Erie's and Miller's summary judgment motions). Finally, in entering nonsuit on the negligence claim, the court found that after resolving any conflicts in the evidence in favor of Appellants, Appellants nevertheless failed to establish a cause of action. **See Staiger**, 100 A.3d at 624.

Appellants' next claim is that the trial court erred in dismissing their UTPCPL-violations claims against both Erie and Miller. Appellants concede that their business entity, LAI, purchased the insurance policies, but argue that this fact "is not controlling," and instead, "[t]heir purpose" — to "purchase insurance products to protect the Lewis family — is." Appellants' Brief at 50, citing *Valley Forge Towers S. Condominium v. Ron-Ike Foam*

*Insulators, Inc.*, 574 A.2d 641 (Pa. Super. 1992) (*Valley Forge Towers*). We disagree.

"The legislative intent in enacting the [UTPCPL] was to enhance the protection of the public from unfair or deceptive business practices. . . . The central underlying intent was fraud prevention, and the act must be construed liberally to effectuate that remedial intent." *Valley Forge Towers*, 574 A.2d at 644. Section 201-9.2(a) provides for "private actions" as follows:

> Any **person** who purchases or leases goods or services **primarily for personal, family or household purposes** and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. . . .

73 P.S. § 201-9.2(a) (emphases added). The UTPCPL defines "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." 73 P.S. § 201-2(2).

In *Valley Forge Towers*, a non-profit condominium association, "pursuant to its statutor[y] authorization to act as representative of the individual condominium unit owners," entered into a contract with the defendant roofing business. *Valley Forge Towers*, 574 A.2d at 642. This Court first noted that the association was a "person" under the UPTCPL. *Id.* at 645. The defendant then argued that "roofing materials were not typical 'consumer products'" under Section 201-9.2's requirement that the goods be

- 17 -

"primarily for personal, family or household purposes." *Id.* at 647. This Court disagreed, observing that the roofing materials were intended for residential units, and thus the purchase was "primarily for a personal, family, or household use." *Id.* at 648. We reasoned that the defendant's "focus upon the **type of product** involved is misplaced. The restriction included in the act addresses itself solely to the **purpose** of the purchase, not the **type of product** purchased." *Id.* (emphases in original).

As Appellants acknowledge, the purchaser of the insurance policies was a business entity — LAI. It is reasonable that Glenn Lewis, the proprietor of LAI who allegedly suffered injuries during the course of his employment, may also be personally affected by whether LAI's insurance policies would pay for his various damages. However, we reject Appellants' suggestion that such a derivative consequence renders LAI's purchase of the policies as "primarily for a personal, family, or household use." *See* 73 P.S. § 201-9.2(a). Whereas the roofing materials in *Valley Forge Towers* were intended to be used on the homes of individual condominium owners, *see Valley Forge Towers*, 574 A.2d at 648, Appellants make no similar argument here — that LAI's policies covered the Lewis family's personal automobiles or property. This latter point is corroborated by Appellants' acknowledgement, elsewhere in their brief, that the Lewis family purchased separate insurance policies from Erie for their household. For these reasons, the trial court did not err in dismissing Appellants' UTPCPL claims against Miller and Erie.

In the fourth issue, Appellants argue that the trial court erred in dismissing — on summary judgment[10] — the claims of fraudulent misrepresentation against both Miller and Erie. Generally, Appellants aver that both Miller and Erie committed fraudulent misrepresentation where: (1) "at trial, neither Erie's adjuster . . . nor . . . Miller could locate the [Umbrella Policy UIM] exclusion in the policy binder"; (2) the Lewises justifiably relied on "Erie's Vice President and Claims Manager's execution of a Release **Erie drafted**, confirming the existence of '[UM/UIM] sections of'" the Garage and Umbrella Policies; (3) Miller failed to meet his "heightened standard of care when recommending the Erie Policies," where Miller "had intimate knowledge of [LAI's] business and . . . knew or should have known that $1,000,000 of coverage would not appropriately protect the Lewises"; and (4) "[t]he Lewises' damages stemming from the lack of bound coverage **and** the lack of proper coverage are undisputed." Appellants' Brief at 53-58 (emphases in original).

In reviewing a summary judgment order:

[W]e must view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. In order to withstand a motion for summary judgment, a non-moving party must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury

---

[10] Although the trial court's Pa.R.A.P. 1925(a) opinion states that the fraudulent misrepresentation claim against Miller was dismissed at trial, Trial Court Opinion, 8/24/18, at 8, the court's June 23, 2016 opinion, issued concomitantly with the summary judgment order, states that it was granting Miller's motion for summary judgment on this claim. Trial Court Opinion, 6/23/16, at 2.

- 19 -

could return a verdict in his favor. Failure to adduce this evidence establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Finally, we stress that summary judgment will be granted only in those cases which are clear and free from doubt. Our scope of review is plenary.

*Toy*, 863 A.2d at 6 (citation omitted).

To establish fraudulent misrepresentation, a party must show:

(1) A representation

(2) which is material to the transaction at hand;

(3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;

(4) with the intent of misleading another into relying on it;

(5) justifiable reliance on the misrepresentation; and,

(6) the resulting injury was proximately caused by the reliance.

*Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa.*, 7 A.3d 278, 290 (Pa. Super. 2010) (citation omitted).

In granting summary judgment, the trial court observed that Appellants' third amended complaint "allege[d] that the tortious misrepresentations occurring during a review of [LAI's] insurance policy with Miller in 'late summer/early fall 2011.'" Trial Court Opinion, 6/23/16, at 2. The court emphasized that this meeting occurred **after** the July 2010 accident, *id.*, and found that Glenn "Lewis produced no evidence any misrepresentations made before the purchase of the insurance coverage in place on July 30, 201[0]." Trial Court Opinion, 8/24/18, at 8. The court concluded: "It is axiomatic that

- 20 -

one cannot rely on a representation that c[a]me after the dispositive decision is already made." Trial Court Opinion, 6/23/16, at 2-3. The court also cited Glenn Lewis's deposition testimony, which was part of the record at the time of summary judgment, "that he did not rely on any representations or explanation from . . . Miller before the accident itself, on the applicability of his umbrella insurance in the event he had to use the UM/UIM provisions of his Garage/Auto Policy." *Id.* at 3. Finally, the court found "Glenn Lewis's own hand written notes taken during this meeting show that before the accident, Lewis did not beli[e]ve he had UM umbrella coverage." Trial Court Opinion, 8/24/18, at 8.

Appellants do not address these findings by the trial court. Further, Appellants again disregard the court's findings that in 1998, Glenn Lewis executed a waiver of UM and UIM coverage in the Umbrella Policy; beginning in 2004, Erie discontinued UM and UIM coverage in the Garage Policy; and every year, Miller suggested potential policies to Lewis which Lewis was free to accept or decline. As the trial court's reasoning is sound, and supported by the record, no relief is due.

In the fifth issue, Appellants argue the trial court erred in admitting into evidence Lewis' 1998 written waiver of UM and UIM coverage (in LAI's Umbrella Policy), as well as related testimony. Appellants aver that this evidence was inadmissible because the waiver was invalid pursuant to Section

1731(c.1) of the Motor Vehicle Financial Responsibility Law[11] (MVFRL). That sub-section states:

> **Form of waiver. —** Insurers shall print the rejection forms required by subsections (b) [pertaining to UM coverage] and (c) [pertaining to UIM coverage] **on separate sheets** in prominent type and location. The forms must be signed by the first named insured and dated to be valid. The signatures on the forms may be witnessed by an insurance agent or broker. **Any rejection form that does not specifically comply with this section is void.** . . .

75 Pa.C.S.A. § 1731(c.1) (emphases added). Appellants maintain that here, the 1998 form contained the rejections for UM and UIM coverage on the same page, and thus "the waiver is invalid, is therefore immaterial to this case, and should have been precluded as irrelevant."[12] Appellants' Brief at 64.

Erie responds that this Court "has specifically held that excess/umbrella liability policies, such as the [Umbrella P]olicy at issue herein, have no statutory mandate to provide UIM coverage." Erie's Brief at 62-63. Erie cites **Kromer v. Reliance Ins. Co.**, 677 A.2d 1224 (Pa. Super. 1996), where this Court concluded that Section 1731 did not apply to an excess-umbrella policy, which "provide[d] third party liability coverage only" and which "clearly indicate[d] that no [UIM] coverage exist[ed]." **Kromer**, 677 A.2d at 1230-31. We further observe:

Pennsylvania law recognizes that not all insurance policies that

---

[11] 75 Pa.C.S.A. §§ 1701-1799.7.

[12] In this issue, Appellants present no argument specifically concerning the Garage Policy.

afford coverage for liability arising out of the operation or use of automobiles are considered motor vehicle liability policies. Specifically, if the policies are excess or umbrella policies, they are not subject to the requirements of the MVFRL. [***Kromer***, 677 A.2d 1224.] Generally, an excess policy is one that "provides for payment of that portion of the claim that remains unpaid once other [liability] coverage is exhausted." An umbrella policy is a type of excess policy.

***Been v. Empire Fire & Marine Ins. Co.***, 751 A.2d 238, 240-241 (some citations omitted).

In light of the foregoing, we agree with Erie that the 1998 UM-and-UIM waiver form for LAI's Umbrella Policy was not subject to the requirements of Section 1731(c.1). ***See Been***, 751 A.2d at 240-41; ***Kromer***, 677 A.2d 1224. We thus reject Appellants' contention that the form was "invalid" because it did not comply with Section 1731(c.1).

In the sixth issue, Appellants claim that the trial court erred in precluding their insurance expert witness, Thomas McKiernan, from testifying at trial. First, Appellants cite the court's reasoning — that McKiernan could not testify about an "available" umbrella policy in 2009, "issued by Banders Standard Insurance Company and Atlantic Mutual Insurance, ACE writing companies," because McKiernan "did not have an exemplar copy in hand." Appellants' Brief at 64-65. Appellants claim this ruling was erroneous because "[e]xperts can rely on information commonly known and accepted," and here, McKiernan did "not need a specific alternative policy in hand to know that there were other viable options." ***Id.*** at 65. Appellants also complain that

the trial court did not hold a **Frye**[13] hearing before ruling that McKiernan "did not pass the **Frye** test." **Id.** at 65. Appellants request that McKiernan's testimony be admitted at a new trial.

"The admission of expert testimony is a matter within the sound discretion of the trial court, whose rulings thereon will not be disturbed absent a manifest abuse of discretion." **Brodowski v. Ryave**, 885 A.2d 1045, 1064 (Pa. Super. 2002) (*en banc*) (citation omitted).

Here, Appellants once again ignore the trial court's emphasis that, after consultation with Miller, Lewis waived UM and UIM coverage in the Umbrella Policy. Thus, the existence of any available umbrella insurance policy that included UM and UIM benefits is not relevant. Furthermore, Appellants' argument is self-serving; although Appellants insist that their expert identified a policy comparable to the Garage Policy, which also offered UM and UIM coverage, Appellants acknowledge that they could not produce a copy of it. The detailed parameters of a particular insurance policy by another insurance company is not "information commonly known and accepted." **See** Appellants' Brief at 65. Thus, the trial court did not err in precluding this evidence. **See** **Brodowski**, 885 A.2d at 1064.

The entire discussion for Appellants' seventh issue, "Imposition of a

---

[13] "**Frye** requires that a proponent of novel scientific testimony demonstrate that the expert relied upon and conventionally applied a scientific method generally accepted in the relevant scientific community." **Walsh v. BASF Corp.**, 191 A.3d 838, 844 (Pa. Super. 2018).

damage cap," spans two paragraphs. Appellants' Brief at 69-70. Appellants argue that the trial court erred in determining they did not suffer personal injury as a result of Miller's or Erie's actions, and erred in "limit[ing] the negligence claim to one of professional negligence for which the compensation is the $1 million policy [that Miller] failed to bind, without taking into account the $10,000,000 in UIM benefits that were available to the Lewises if not for [Miller's] negligence." *Id.* at 69. Appellants maintain that they presented undisputed evidence — in the form of an expert report by Glenn Lewis's treating physician — that Lewis suffered "psychological injuries and physical manifestations[ ] stemming from the lack of coverage." *Id.* at 70. Appellants thus request a new trial without any "damages cap." *Id.*

Again, Appellants disregard the jury's finding that Glenn Lewis was contributorily negligent, and this finding was an absolute bar to recovery.[14]

---

[14] The trial court's opinion provides some context for this issue. The court explained that to avoid the absolute bar to recovery triggered by a finding of contributory negligence, Appellants sought a jury charge on comparative negligence, which would allow non-economic damages. Trial Court Opinion, 8/24/18, at 10. To this end, Appellants claimed non-economic damages arising from "stress and emotional distress because of Miller's negligence." *Id.* The trial court concluded, however, that Appellants' argument for non-economic damages was misplaced "because damages for non-economic loss arise from bodily injury under Pa.R.C.P. 223.[3], not from monetary loss associated with professional negligence." Trial Court Opinion, 8/24/18, at 11; *see* Pa.R.C.P. 223.3 (setting forth the instruction to be given to a jury "[i]n any action for bodily injury or death in which a plaintiff has raised a claim for a damage award for noneconomic loss that is viable under applicable substantive law").

*See Boyle*, 6 A.3d at 492 n.1. The scope and amount of damages that Appellants were permitted to seek is moot.

In the eighth issue, Appellants challenge the trial court's preclusion of evidence of LAI's "current [insurance] policies," where the court found the policies were "produced after the September 8, 2015 discovery deadline." Appellants' Brief at 70. Appellants state that after a December 30, 2014 letter from Miller "stat[ing] that no greater coverage was possible," Glenn Lewis:

> contacted a different insurance agent . . . who identified a group of policies available as early as 2009 that provided substantially similar coverage for $4,595 less per year. That same coverage plus an umbrella policy that would apply to Mr. Lewis's personal use of his corporate car — an identical loss to the one at issue herein — would have provided a total of $11 million of UIM coverage for $1,918 per year. [The other agent] bound that coverage for the Policy Period of 9/27/2015 to 9/27/2016 — the very first renewal period after [Miller] advised that no such coverage was possible, and Appellants promptly produced the policies to [the defendants], more than two years prior to trial.

*Id.* at 71 (citations to record omitted). Appellants claim they were prejudiced by the court's evidentiary ruling because these policies "would have provided sufficient coverage for their uncontroverted special damages of [$4.1 to $4.3 million] plus pain and suffering, as the jury only heard that $1 million was the

---

Appellants do not address or dispute any of this reasoning in their brief. Instead, as stated above, Appellants generally argue that they presented evidence of Lewis's alleged bodily injuries, without acknowledgment that the jury's findings barred recovery. We address only the argument as articulated by Appellants and conclude that no relief is due. *See Commonwealth v. Kane*, 10 A.3d 327, 331 (Pa. Super. 2010) ("This Court will not act as counsel and will not develop arguments on behalf of an appellant.").

- 26 -

maximum possible coverage." *Id.* at 72.

Appellants' argument is not entirely clear. We reiterate that the only issues for the jury were Appellants' claim of negligence against Miller and Miller's defense of contributory negligence. To the extent that Appellants aver that evidence of their so-called "current policies" supported their claim of negligence, we emphasize that the jury **found** Miller to be negligent. As to Appellants' claim they were entitled to damages, they again ignore the jury's finding that Lewis was contributorily negligent, barring any recovery. Accordingly, no relief is due.

Appellants also challenge the trial court's grant of Miller's motion to preclude evidence of Miller's website. Appellants claim that although the court found the "website could not be authenticated," Miller made no such claim,[15] and further, Appellants should have been granted the opportunity to authenticate through Art Miller. Appellants' Brief at 76. Appellants contend that the website is relevant evidence of Miller's "duties and standards of care, summarized as their Client Services and Promises and Guarantee." *Id.*

Again, Appellants' argument is not entirely clear. To the extent Appellants aver the website was relevant to their claim of negligence against Miller, we reiterate that the jury found Miller to be negligent. With respect to

---

[15] Appellants assert that Miller's argument for preclusion was "that Glenn Lewis dealt directly with Art Miller, rather than doing business through [Miller's] website." Appellants' Brief at 76.

the claim of breach of fiduciary duty, even if the evidence was admitted, we have explained that Appellants failed to demonstrate that Lewis was especially vulnerable and that Miller exercised undue influence over him. *See Yenchi*, 161 A.3d at 819-820; *Dixon*, 146 A.3d at 787.

Finally, we address Appellants' last two issues together. In the issue, entitled "CONTRIBUTORY VERSUS COMPARATIVE NEGLIGENCE," Appellants present various arguments: (1) that while the trial court cited the 1998 UIM-waiver form in its analysis (Glenn Lewis's own negligence supported Miller's defense of contributory negligence), the waiver form was inadmissible because it "did not conform to statute"; (2) "[c]ontributory negligence is appropriate only where a case is excluded from the statutory parameters of comparative negligence, meaning the jury would have to determine that Appellants suffered no personal injuries attributable to" Miller; and (3) Lewis' psychological injuries "stem[med] in part from the knowledge that none of his financial injuries and stresses would exist[ ] had [Miller] met [his] duties." Appellants' Brief at 78-80.

Finally, in a single paragraph, Appellants cite "the collateral source rule" and argue the trial court erred by allowing Miller and Erie to elicit testimony — and make opening arguments — mentioning the $1,000,000 Appellants "received from the underlying policy." Appellants' Brief at 80. Appellants reason: "Discussion of a separate insurance payment violates the collateral source rule, and the repeated mention of this $1 million payment by both

defense counsel and the court extremely prejudiced the jury." *Id.* at 81.

This Court has stated:

"The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority." "Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention." This Court will not act as counsel and will not develop arguments on behalf of an appellant. Moreover, we observe that the Commonwealth Court, our sister appellate court, has aptly noted that "[m]ere issue spotting without analysis or legal citation to support an assertion precludes our appellate review of [a] matter."

*Coulter v. Ramsden*, 94 A.3d 1080, 1088-89 (Pa. Super. 2014) (citations omitted).

Neither of Appellants' last two issues — which touch upon several legal issues — include any citation to or discussion of legal authority. Accordingly, the issues are waived. ***See id.***

For the foregoing reasons, we find no merit to Appellants' issue. We therefore affirm the judgment entered in favor of Miller and Erie.

Judgment affirmed.

Judge Shogan joins the memorandum.

Judge Nichols concurs in the result.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 8/21/2019*